## BAXTER ET AL. *v.* PALMIGIANO

No. 74–1187.   Argued December 15, 1975—Decided April 20, 1976[*]

---

[*]Together with No. 74–1194, *Enomoto, Corrections Director, et al.* v. *Clutchette et al.*, on certiorari to the United States Court of Appeals for the Ninth Circuit.

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, BLACKMUN, POWELL, and REHNQUIST, JJ., joined, and in Part V of which BRENNAN and MARSHALL, JJ., joined. BRENNAN, J., filed an opinion concurring in part and dissenting in part, in which MARSHALL, J., joined, *post*, p. 324. STEVENS, J., took no part in the consideration or decision of the cases.

*Ronald A. Dwight,* Special Assistant Attorney General of Rhode Island, argued the cause for petitioners in No. 74–1187. With him on the brief was *Julius C.*

*Michaelson,* Attorney General. *William D. Stein,* Deputy Attorney General of California, argued the cause for petitioners in No. 74-1194. With him on the brief were *Evelle J. Younger,* Attorney General, *Jack R. Winkler,* Chief Assistant Attorney General, *Edward P. O'Brien,* Assistant Attorney General, and *W. Eric Collins* and *Morris Lenk,* Deputy Attorneys General.

*Stephen J. Fortunato, Jr.,* argued the cause for respondent in No. 74-1187. With him on the brief was *David Carliner. William Bennett Turner* argued the cause for respondents in No. 74-1194. With him on the brief were *John Thorne, Lowell Johnston, Jack Greenberg, Stanley A. Bass,* and *Fay Stender.*†

MR. JUSTICE WHITE delivered the opinion of the Court.

These cases present questions as to procedures required at prison disciplinary hearings and as to the reach of our recent decision in *Wolff* v. *McDonnell,* 418 U. S. 539 (1974).

I

A. *No. 74-1194*

Respondents are inmates of the California penal institution at San Quentin. They filed an action under 42 U. S. C. § 1983 seeking declaratory and injunctive relief and alleging that the procedures used in disciplinary proceedings at San Quentin violated their rights to due process and equal protection of the laws under the Fourteenth Amendment of the Constitution.[1] After an evi-

---

†*Solicitor General Bork, Assistant Attorney General Thornburgh, Jerome M. Feit,* and *George S. Kopp* filed a brief for the United States as *amicus curiae* in both cases.

[1] Respondents John Wesley Clutchette and George L. Jackson brought suit "on their own behalf, and, pursuant to Rule 23 (b) (1) and Rule 23 (b)(2) of the Federal Rules of Civil Procedure, on

dentiary hearing, the District Court granted substantial relief. *Clutchette* v. *Procunier*, 328 F. Supp. 767 (ND Cal. 1971). The Court of Appeals for the Ninth Circuit, with one judge dissenting, affirmed, 497 F. 2d 809 (1974), holding that an inmate facing a disciplinary proceeding at San Quentin was entitled to notice of the charges against him, to be heard and to present witnesses, to confront and cross-examine witnesses, to face a neutral and detached hearing body, and to receive a decision based solely on evidence presented at the hearing. The court also held that an inmate must be provided with counsel or a counsel-substitute when the consequences

---

behalf of all other inmates of San Quentin State Prison subject to defendants' jurisdiction and affected by the policies, practices or acts of defendants complained of herein." Plaintiffs' Amended Complaint, 1 Record 33 (No. 74–1194). The District Court treated the suit as a class action, *Clutchette* v. *Procunier*, 328 F. Supp. 767, 769–770 (ND Cal. 1971), but did not certify the action as a class action within the contemplation of Fed. Rules Civ. Proc. 23 (c)(1) and 23 (c)(3). Without such certification and identification of the class, the action is not properly a class action. *Indianapolis School Comm'rs* v. *Jacobs*, 420 U. S. 128 (1975). We were advised at oral argument in No. 74–1194 that respondent Clutchette was paroled in 1972, two years after the suit was filed; counsel for respondents conceded that the case is moot as to him. Tr. of Oral Arg. (No. 74–1194), p. 34. We were further advised that respondent Jackson died after the suit was filed. However, the parties stipulated on June 21, 1972, to the intervention of Alejandro R. Ferrel as a named party plaintiff in the suit. 3 Record 285 (No. 74–1194). The parties further stipulated the facts that, like Clutchette and Jackson, Ferrel was an inmate at San Quentin who was brought before a disciplinary committee for an infraction that could have also led to state criminal proceedings, that he asked for and was denied an attorney at the hearing, and that he was assigned to "segregation" for an unspecified number of days for the infraction. Ferrel, we were told at oral argument, is still incarcerated at San Quentin. Tr. of Oral Arg. 34 (No. 74–1194). He thus has standing as a named plaintiff to raise the issues before us in No. 74–1194.

of the disciplinary action are "serious," such as pro-longed periods of "isolation." *Id.*, at 821. The panel of the Court of Appeals, after granting rehearing to reconsider its conclusions in light of our intervening decision in *Wolff, supra,* reaffirmed its initial judgment—again with one judge dissenting—but modified its prior opinion in several respects. 510 F. 2d 613 (1975). The Court of Appeals held that minimum notice and a right to respond are due an inmate faced even with a temporary suspension of privileges, that an inmate at a disciplinary hearing who is denied the privilege of con-fronting and cross-examining witnesses must receive writ-ten reasons for such denial or the denial "will be deemed prima facie evidence of abuse of discretion," *id.*, at 616, and—reaffirming its initial view—that an inmate facing prison discipline for a violation that might also be punishable in state criminal proceedings has a right to counsel (not just counsel-substitute) at the prison hear-ing. We granted certiorari and set the case for oral argu-ment with No. 74–1187. 421 U. S. 1010 (1975).

## B. *No. 74–1187*

Respondent Palmigiano is an inmate of the Rhode Island Adult Correctional Institution serving a life sen-tence for murder. He was charged by correctional officers with "inciting a disturbance and disrupt[ion] of [prison] operations, which might have resulted in a riot." App. 197 (No. 74–1187). He was summoned before the prison Disciplinary Board and informed that he might be prosecuted for a violation of state law, that he should consult his attorney (although his attorney was not permitted by the Board to be present during the hearing), that he had a right to remain silent during the hearing but that if he remained silent his silence would be held against him. Respondent availed himself of the counsel-substitute provided for by prison rules and re-

mained silent during the hearing. The Disciplinary Board's decision was that respondent be placed in "punitive segregation" for 30 days and that his classification status be downgraded thereafter.

Respondent filed an action under 42 U. S. C. § 1983 for damages and injunctive relief, claiming that the disciplinary hearing violated the Due Process Clause of the Fourteenth Amendment of the Constitution.[2] The Dis-

---

[2] The United States as *amicus curiae* suggests that No. 74–1187 is not properly before the Court because the case involves the constitutionality of regulations of the Rhode Island Adult Corrections Authority and hence should have been heard by a three-judge court, subject to review here on direct appeal. The applicable regulations of the Authority when this case was brought had been promulgated as the result of a negotiated settlement of litigation in the District Court for the District of Rhode Island. *Morris* v. *Travisono,* 310 F. Supp. 857 (1970). It is conceded that they have become state law, and it would appear that they are of statewide effect. The rules on their face, however, although regulating in some detail the procedures required in prison disciplinary hearings, do not expressly grant or deny, or even mention, the right to counsel where charges brought are also a crime under state law. Nor do they suggest, one way or the other, whether an inmate's silence may be used against him in the proceeding itself. Palmigiano's complaint did not mention or challenge any rule or regulation of the Authority; nor did it seek an injunction against the enforcement of any identified rule. What it asked was that the Board's disciplinary decision be declared invalid and its enforcement enjoined. Neither Palmigiano nor the State asked or suggested that a three-judge court be convened. It would not appear that the District Court considered the validity of any of the Authority's rules to be at stake. That court ruled Palmigiano was not entitled to be represented by counsel, not because the applicable rules forbade it but because it considered the controlling rule under the relevant cases was to this effect. The Court of Appeals, although quite aware that constitutional attacks on the Rhode Island prison rules might necessitate a three-judge court, see *Souza* v. *Travisono,* 498 F. 2d 1120, 1121–1122 (CA1 1974), evidently did not doubt its jurisdiction in this case. On the record before us, the provisions of 28 U. S. C. § 2281 with respect to three-judge courts would not appear to be applicable.

trict Court held an evidentiary hearing and denied relief. The Court of Appeals for the First Circuit, with one judge dissenting, reversed, holding that respondent "was denied due process in the disciplinary hearing only insofar as he was not provided with use immunity for statements he might have made within the disciplinary hearing, and because he was denied access to retained counsel within the hearing." 487 F. 2d 1280, 1292 (1973). We granted certiorari, vacated the judgment of the Court of Appeals, and remanded to that court for further consideration in light of *Wolff* v. *McDonnell, supra,* decided in the interim. 418 U. S. 908 (1974). On remand, the Court of Appeals affirmed its prior decision but modified its opinion. 510 F. 2d 534 (1974). The Court of Appeals held that an inmate at a prison disciplinary proceeding must be advised of his right to remain silent, that he must not be questioned further once he exercises that right, and that such silence may not be used against him at that time or in future proceedings. With respect to counsel, the Court of Appeals held:

> "[I]n cases where criminal charges are a realistic possibility, prison authorities should consider whether defense counsel, if requested, should not be let into the disciplinary proceeding, not because *Wolff* requires it in that proceeding, but because *Miranda* [v. *Arizona,* 384 U. S. 436 (1966)] requires it in light of future criminal prosecution." *Id.,* at 537.

We granted certiorari and heard the case with No. 74–1194. 421 U. S. 1010 (1975).

## II

In *Wolff* v. *McDonnell, supra,* drawing comparisons to *Gagnon* v. *Scarpelli,* 411 U. S. 778 (1973), we said:

> "The insertion of counsel into the [prison] disciplinary process would inevitably give the proceedings

a more adversary cast and tend to reduce their utility as a means to further correctional goals. There would also be delay and very practical problems in providing counsel in sufficient numbers at the time and place where hearings are to be held. At this stage of the development of these procedures we are not prepared to hold that inmates have a right to either retained or appointed counsel in disciplinary proceedings." 418 U. S., at 570.

Relying on *Miranda* v. *Arizona,* 384 U. S. 436 (1966), and *Mathis* v. *United States,* 391 U. S. 1 (1968), both Courts of Appeals in these cases held that prison inmates are entitled to representation at prison disciplinary hearings where the charges involve conduct punishable as a crime under state law, not because of the services that counsel might render in connection with the disciplinary proceedings themselves, but because statements inmates might make at the hearings would perhaps be used in later state-court prosecutions for the same conduct.

Neither *Miranda, supra,* nor *Mathis, supra,* has any substantial bearing on the question whether counsel must be provided at "[p]rison disciplinary hearings [which] are not part of a criminal prosecution." *Wolff* v. *McDonnell, supra,* at 556. The Court has never held, and we decline to do so now, that the requirements of those cases must be met to render pretrial statements admissible in other than criminal cases.

We see no reason to alter our conclusion so recently made in *Wolff* that inmates do not "have a right to either retained or appointed counsel in disciplinary hearings." 418 U. S., at 570. Plainly, therefore, state authorities were not in error in failing to advise Palmigiano to the contrary, *i. e.,* that he was entitled to counsel at the hearing and that the State would furnish counsel if he did not have one of his own.

### III

Palmigiano was advised that he was not required to testify at his disciplinary hearing and that he could remain silent but that his silence could be used against him. The Court of Appeals for the First Circuit held that the self-incrimination privilege of the Fifth Amendment, made applicable to the States by reason of the Fourteenth Amendment, forbids drawing adverse inferences against an inmate from his failure to testify. The State challenges this determination, and we sustain the challenge.

As the Court has often held, the Fifth Amendment "not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz* v. *Turley,* 414 U. S. 70, 77 (1973). Prison disciplinary hearings are not criminal proceedings; but if inmates are compelled in those proceedings to furnish testimonial evidence that might incriminate them in later criminal proceedings, they must be offered "whatever immunity is required to supplant the privilege" and may not be required to "waive such immunity." *Id.,* at 85; *Garrity* v. *New Jersey,* 385 U. S. 493 (1967); *Gardner* v. *Broderick,* 392 U. S. 273 (1968); *Sanitation Men* v. *Sanitation Comm'r,* 392 U. S. 280 (1968). In this line of cases from *Garrity* to *Lefkowitz,* the States, pursuant to statute, sought to interrogate individuals about their job performance or about their contractual relations with the State; insisted upon waiver of the Fifth Amendment privilege not to respond or to object to later use of the incriminating statements in criminal prosecutions; and, upon refusal to waive, automatically

terminated employment or eligibility to contract with the State. Holding that the State could not constitutionally seek to compel testimony that had not been immunized by threats of serious economic reprisal, we invalidated the challenged statutes.

The Court has also plainly ruled that it is constitutional error under the Fifth Amendment to instruct a jury in a criminal case that it may draw an inference of guilt from a defendant's failure to testify about facts relevant to his case. *Griffin* v. *California,* 380 U. S. 609 (1965). This holding paralleled the existing statutory policy of the United States, *id.,* at 612, and the governing statutory or constitutional rule in the overwhelming majority of the States. 8 J. Wigmore, Evidence 425–439 (McNaughton rev. 1961).

The Rhode Island prison rules do not transgress the foregoing principles. No criminal proceedings are or were pending against Palmigiano. The State has not, contrary to *Griffin,* sought to make evidentiary use of his silence at the disciplinary hearing in any criminal proceeding. Neither has Rhode Island insisted or asked that Palmigiano waive his Fifth Amendment privilege. He was notified that he was privileged to remain silent if he chose. He was also advised that his silence could be used against him, but a prison inmate in Rhode Island electing to remain silent during his disciplinary hearing, as respondent Palmigiano did here, is not in consequence of his silence automatically found guilty of the infraction with which he has been charged. Under Rhode Island law, disciplinary decisions "must be based on substantial evidence manifested in the record of the disciplinary proceeding." *Morris* v. *Travisono,* 310 F. Supp. 857, 873 (RI 1970). It is thus undisputed that an inmate's silence in and of itself is insufficient to support an adverse decision by the Disciplinary Board. In

318

this respect, this case is very different from the circumstances before the Court in the *Garrity-Lefkowitz* decisions, where refusal to submit to interrogation and to waive the Fifth Amendment privilege, standing alone and without regard to the other evidence, resulted in loss of employment or opportunity to contract with the State. There, failure to respond to interrogation was treated as a final admission of guilt. Here, Palmigiano remained silent at the hearing in the face of evidence that incriminated him; and, as far as this record reveals, his silence was given no more evidentiary value than was warranted by the facts surrounding his case. This does not smack of an invalid attempt by the State to compel testimony without granting immunity or to penalize the exercise of the privilege. The advice given inmates by the decisionmakers is merely a realistic reflection of the evidentiary significance of the choice to remain silent.

Had the State desired Palmigiano's testimony over his Fifth Amendment objection, we can but assume that it would have extended whatever use immunity is required by the Federal Constitution. Had this occurred and had Palmigiano nevertheless refused to answer, it surely would not have violated the Fifth Amendment to draw whatever inference from his silence that the circumstances warranted. Insofar as the privilege is concerned, the situation is little different where the State advises the inmate of his right to silence but also plainly notifies him that his silence will be weighed in the balance.

Our conclusion is consistent with the prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment "does not preclude the inference where the privilege is claimed by a *party to a civil cause.*" 8 J. Wigmore, Evidence 439 (McNaughton rev. 1961). In criminal cases, where the stakes are

higher and the State's sole interest is to convict, *Griffin* prohibits the judge and prosecutor from suggesting to the jury that it may treat the defendant's silence as substantive evidence of guilt. Disciplinary proceedings in state prisons, however, involve the correctional process and important state interests other than conviction for crime. We decline to extend the *Griffin* rule to this context.

It is important to note here that the position adopted by the Court of Appeals is rooted in the Fifth Amendment and the policies which it serves. It has little to do with a fair trial and derogates rather than improves the chances for accurate decisions. Thus, aside from the privilege against compelled self-incrimination, the Court has consistently recognized that in proper circumstances silence in the face of accusation is a relevant fact not barred from evidence by the Due Process Clause. *Adamson* v. *California,* 332 U. S. 46 (1947); *United States ex rel. Bilokumsky* v. *Tod,* 263 U. S. 149, 153–154 (1923); *Raffel* v. *United States,* 271 U. S. 494 (1926); *Twining* v. *New Jersey,* 211 U. S. 78 (1908). See also *United States* v. *Hale,* 422 U. S. 171, 176–177 (1975); *Gastelum-Quinones* v. *Kennedy,* 374 U. S. 469, 479 (1963); *Grunewald* v. *United States,* 353 U. S. 391, 418–424 (1957). Indeed, as Mr. Justice Brandeis declared, speaking for a unanimous court in the *Tod* case, *supra,* which involved a deportation: "Silence is often evidence of the most persuasive character." 263 U. S., at 153–154. And just last Term in *Hale, supra,* the Court recognized that "[f]ailure to contest an assertion . . . is considered evidence of acquiescence . . . if it would have been natural under the circumstances to object to the assertion in question." 422 U. S., at 176.[3]

---

[3] The Court based its statement on 3A J. Wigmore, Evidence § 1042 (Chadbourn rev. 1970), which reads as follows:

"Silence, omissions, or negative statements, as inconsistent: (1) Silence, etc., as constituting the impeaching statement. A

The short of it is that permitting an adverse inference to be drawn from an inmate's silence at his disciplinary proceedings is not, on its face, an invalid practice; and there is no basis in the record for invalidating it as here applied to Palmigiano.[4]

## IV

In *Wolff* v. *McDonnell,* we held that "the inmate facing disciplinary proceedings should be allowed to call

---

*failure to assert* a fact, when it would have been natural to assert it, amounts in effect to an assertion of the non-existence of. the fact. This is conceded as a general principle of evidence (§ 1071 *infra*). There may be explanations, indicating that the person had in truth no belief of that tenor; but the conduct is 'prima facie' an inconsistency.

"There are several common classes of cases:

"(1) Omissions *in legal proceedings* to assert what would naturally have been asserted under the circumstances.

"(2) Omissions to assert anything, or to speak with such detail or positiveness, *when formerly narrating,* on the stand or elsewhere, the matter now dealt with.

"(3) *Failure to take the stand* at all, when it would have been natural to do so.

"In all of these much depends on the individual circumstances, and in all of them the underlying test is, would it have been natural for the person to make the assertion in question?" (Emphasis in original.) (Footnotes omitted.)

[4] The record in No. 74–1187 shows that Palmigiano was provided with copies of the Inmate Disciplinary Report and the superior's investigation report, containing the charges and primary evidence against him, on the day before the disciplinary hearing. At the hearing, Captain Baxter read the charge to Palmigiano and summarized the two reports. In the face of the reports, which he had seen, Palmigiano elected to remain silent. The Disciplinary Board's decision was based on these two reports, Palmigiano's decision at the hearing not to speak to them, and supplementary reports made by the officials filing the initial reports. All of the documents were introduced in evidence at the hearing before the District Court in this case. App. 197–202 (No. 74–1187).

witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." 418 U. S., at 566. We noted that "[o]rdinarily, the right to present evidence is basic to a fair hearing; but the unrestricted right to call witnesses from the prison population carries obvious potential for disruption and for interference with the swift punishment that in individual cases may be essential to carrying out the correctional program of the institution." *Ibid.* The right to call witnesses, like other due process rights delineated in *Wolff,* is thus circumscribed by the necessary "mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application." *Id.,* at 556. Within the reasonable limitations necessary in the prison disciplinary context, we suggested, but did not require, that the disciplinary committee "state its reason for refusing to call a witness, whether it be for irrelevance, lack of necessity, or the hazards presented in individual cases." *Id.,* at 566.

We were careful to distinguish between this limited right to call witnesses and other due process rights at disciplinary hearings. We noted expressly that, in comparison to the right to call witnesses, "[c]onfrontation and cross-examination present greater hazards to institutional interests." *Id.,* at 567. We said:

> "If confrontation and cross-examination of those furnishing evidence against the inmate were to be allowed as a matter of course, as in criminal trials, there would be considerable potential for havoc inside the prison walls. Proceedings would inevitably be longer and tend to unmanageability." *Ibid.*

We therefore concluded that "[t]he better course at this time, in a period where prison practices are diverse and

somewhat experimental, is to leave these matters to the sound discretion of the officials of state prisons." *Id.,* at 569.

Although acknowledging the strictures of *Wolff* with respect to confrontation and cross-examination, the Court of Appeals for the Ninth Circuit, on rehearing in No. 74–1194, went on to require prison authorities to provide reasons in writing to inmates denied the privilege to cross-examine or confront witnesses against them in disciplinary proceedings; absent explanation, failure to set forth reasons related to the prevention of one or more of the four concerns expressly mentioned in *Wolff* would be deemed prima facie abuse of discretion.

This conclusion is inconsistent with *Wolff.* We characterized as "useful," but did not require, written reasons for denying inmates the limited right to call witnesses in their defense. We made no such suggestion with respect to confrontation and cross-examination which, as was there pointed out, stand on a different footing because of their inherent danger and the availability of adequate bases of decision without them. See 418 U. S., at 567–568. Mandating confrontation and cross-examination, except where prison officials can justify their denial on one or more grounds that appeal to judges, effectively preempts the area that *Wolff* left to the sound discretion of prison officials.[5] We add that on the record before us

---

[5] The Court of Appeals also held, in its initial opinion (unmodified in rehearing with respect to this point), that "the disciplinary committee must be required to make its fact finding determinations based solely upon the evidence presented at the hearing" in order "[f]or the right to confront and cross-examine adverse witnesses to be meaningful." 497 F. 2d, at 820. Because we have held that there is no general right to confront and cross-examine adverse witnesses, it follows that the Court of Appeals' holding on this point must fall with its rejected premise. Due to the peculiar environment of the prison setting, it may be that certain facts

there is no evidence of the abuse of discretion by the state prison officials.

## V

Finally, the Court of Appeals for the Ninth Circuit in No. 74–1194 held that minimum due process—such as notice, opportunity for response, and statement of reasons for action by prison officials—was necessary where inmates were deprived of privileges. 510 F. 2d, at 615. We did not reach the issue in *Wolff;* indeed, we said: "We do not suggest, however, that the procedures required by today's decision for the deprivation of good time would also be required for the imposition of lesser penalties such as the loss of privileges." 418 U. S., at 572 n. 19. Nor do we find it necessary to reach the issue now in light of the record before us. None of the named plaintiffs in No. 74–1194 was subject solely to loss of privileges; all were brought before prison disciplinary hearings for allegations of the type of "serious misconduct," 418 U. S., at 558, that we held in *Wolff* to trigger procedures therein outlined. See n. 1, *supra.* Without such a record, we are unable to consider the degree of "liberty" at stake in loss of privileges and thus whether some sort of procedural safeguards are due when only such "lesser penalties" are at stake. To the extent that the Court of Appeals for the Ninth Circuit required any procedures in such circumstances, the Court of Ap-

---

relevant to the disciplinary determination do not come to light until after the formal hearing. It would be unduly restrictive to require that such facts be excluded from consideration, inasmuch as they may provide valuable information with respect to the incident in question and may assist prison officials in tailoring penalties to enhance correctional goals. In so stating, however, we in no way diminish our holding in *Wolff* that "there must be a 'written statement by the factfinders as to the evidence relied on and reasons' for the disciplinary action." 418 U. S., at 564.

peals acted prematurely, and its decision on the issue cannot stand.[6]

We said in *Wolff* v. *McDonnell*: "As the nature of the prison disciplinary process changes in future years, circumstances may then exist which will require further consideration and reflection of this Court. It is our view, however, that the procedures we have now required in prison disciplinary proceedings represent a reasonable accommodation between the interests of the inmates and the needs of the institution." 418 U. S., at 572. We do not retreat from that view. However, the procedures required by the Courts of Appeals in Nos. 74–1187 and 74–1194 are either inconsistent with the "reasonable accommodation" reached in *Wolff*, or premature on the bases of the records before us. The judgments in Nos. 74–1187 and 74–1194 accordingly are

*Reversed.*

MR. JUSTICE STEVENS took no part in the consideration or decision of these cases.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE MARSHALL joins, concurring in part and dissenting in part.

I agree that consideration of the procedural safeguards necessary where an inmate is deprived only of privileges is premature on this record, and thus I join Part V of the Court's opinion, which leaves open whether an inmate may be deprived of privileges in the absence of due process safeguards.

---

[6] Petitioners in No. 74–1194 have not challenged the holdings of the Court of Appeals for the Ninth Circuit with respect to notice, 497 F. 2d, at 818, or to the right to be heard by a "neutral and detached" hearing body, *id.*, at 820. Cf. 418 U. S., at 570–571. Because these holdings are no longer in issue, it is unnecessary for us to consider them.

Parts II and IV of the Court's opinion simply reaffirm *Wolff* v. *McDonnell*, 418 U. S. 539 (1974). I continue to believe that *Wolff* approved procedural safeguards short of the minimum requirements of the Due Process Clause, and I dissent from Parts II and IV for the reasons stated by my Brother MARSHALL, 418 U. S., at 580.

Part III of the Court's opinion, however, confronts an issue not present in *Wolff* [1] and in my view reaches an erroneous conclusion. The Court acknowledges that inmates have the right to invoke the privilege against compulsory self-incrimination in prison disciplinary proceedings, *ante,* at 316, but nevertheless holds that "permitting an adverse inference to be drawn from an inmate's silence at his disciplinary proceedings is not, on its face, an invalid practice," *ante,* at 320, and was proper in the circumstances of this case. This conclusion cannot be reconciled with the numerous cases holding that the government is barred from penalizing an individual for exercising the privilege; precedents require the holding that if government officials ask questions of an indi-

---

[1] I agree that No. 74–1194 is not moot, since the intervening plaintiff (Ferrell) has a personal stake in the outcome of this litigation. But the citation of *Indianapolis School Comm'rs* v. *Jacobs,* 420 U. S. 128 (1975), is inapposite. We held that case moot because the named plaintiffs no longer had a personal stake in the outcome, and the action had not been formally certified as a class action. *Id.,* at 129. We did not, however, hold that without such formal certification "the action is not properly a class action." *Ante,* at 311 n. 1. *Jacobs* applies only to the determination of mootness, and did not deal with whether, for example, a court of appeals may treat an action as a class action in the absence of formal certification by the district court. Moreover, the propriety of the certification need not be addressed, since there is a plaintiff with a personal interest in the outcome. *Youakim* v. *Miller, ante,* at 236–237, n. 2.

vidual to elicit incriminating information, as happened here, the imposition of any substantial sanction on that individual for remaining silent violates the Fifth Amendment. That principle prohibits reliance on any inference of guilt from the exercise of the privilege in the context of a prison disciplinary hearing.

## I

As we have frequently and consistently recognized:

"The constitutional privilege against self-incrimination has two primary interrelated facets: The Government may not use compulsion to elicit self-incriminating statements, see, *e. g.*, *Counselman* v. *Hitchcock*, 142 U. S. 547; and the Government may not permit the use in a criminal trial of self-incriminating statements elicited by compulsion. See, *e. g.*, *Haynes* v. *Washington*, 373 U. S. 503." *Murphy* v. *Waterfront Comm'n*, 378 U. S. 52, 57 n. 6 (1964).

Indeed, only weeks ago we said that "the privilege protects against the use of compelled statements *as well as* guarantees the right to remain silent absent immunity." *Garner* v. *United States*, 424 U. S. 648, 653 (1976) (emphasis supplied). *Malloy* v. *Hogan*, 378 U. S. 1 (1964), held, that the Fifth Amendment—the "essential mainstay" of our "American system of criminal prosecution," *id.*, at 7—protects "the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence." *Id.*, at 8. See *Spevack* v. *Klein*, 385 U. S. 511, 514 (1967). As THE CHIEF JUSTICE noted last Term: "This Court has always broadly construed [the Fifth Amendment] protection to assure that an individual is not compelled to produce evidence which later may be used against him as an accused in a criminal action." *Maness* v. *Meyers*, 419 U. S. 449, 461

(1975). Further, "a witness protected by the privilege may rightfully refuse to answer unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant. *Kastigar* v. *United States,* 406 U. S. 441 (1972)." *Lefkowitz* v. *Turley,* 414 U. S. 70, 78 (1973). See *Maness* v. *Meyers, supra,* at 473 (WHITE, J., concurring in result).

Thus, the Fifth Amendment not only excludes from use in criminal proceedings any evidence obtained from the defendant in violation of the privilege, but also is operative before criminal proceedings are instituted: it bars the government from using compulsion to obtain incriminating information from any person. Moreover, the protected information "does not merely encompass evidence which may lead to criminal conviction, but includes information which would furnish a link in the chain of evidence that could lead to prosecution . . . . *Hoffman* v. *United States,* 341 U. S. 479, 486 (1951)." *Maness* v. *Meyers, supra,* at 461. And it is not necessary that a person be guilty of criminal misconduct to invoke the privilege; an innocent person, perhaps fearing that revelation of information would tend to connect him with a crime he did not commit, also has its protection. " 'The privilege serves to protect the innocent who otherwise might be ensnared by ambiguous circumstances.' " *Grunewald* v. *United States,* 353 U. S. 391, 421 (1957), quoting *Slochower* v. *Board of Education,* 350 U. S. 551, 557–558 (1956). See E. Griswold, The Fifth Amendment Today 10–22 (1955); Ratner, Consequences of Exercising the Privilege Against Self-Incrimination, 24 U. Chi. L. Rev. 472 (1957).

Accordingly, the fact that no criminal proceedings were pending against Palmigiano, *ante,* at 317, does not answer the crucial question posed by this case. The evidentiary

use of his statements in a criminal proceeding lurked in the background, but the significant element for this case is that the Fifth Amendment also prohibits the government from compelling an individual to disclose information that might tend to connect him with a crime. *Maness* v. *Meyers, supra,* pointed up this distinction in its recognition that availability of motions to suppress compelled testimonial evidence do not remedy the Fifth Amendment violation. 419 U. S., at 460, 463.

## II

It was this aspect of the privilege that we relied on in a line of cases beginning with *Garrity* v. *New Jersey,* 385 U. S. 493 (1967), and leading up to *Lefkowitz* v. *Turley, supra.* The Court says today that "this case is very different," *ante,* at 318, but in my view the *Garrity-Lefkowitz* cases are compelling authority that drawing an adverse inference from an inmate's exercise of the privilege to convict him of a disciplinary offense violates the Fifth Amendment.

In *Garrity* policemen were summoned to testify in the course of an investigation of police corruption. They were told that they could claim the privilege, but would be discharged if they did. *Garrity* held that imposition of the choice between self-incrimination and job forfeiture denied the constitutionally required "free choice to admit, to deny, or to refuse to answer." *Lisenba* v. *California,* 314 U. S. 219, 241 (1947). Subsequent criminal convictions were therefore set aside on the ground that the unconstitutionally compelled testimony should not have been admitted in evidence at trial.

In *Spevack* v. *Klein, supra,* decided the same day as *Garrity,* an attorney refused to honor a subpoena calling for production of certain financial records; the sole basis for the refusal was the privilege against self-incrimination. He was disbarred for exercising the privilege, and

the disbarment was challenged in this Court as infringing the Fifth Amendment. Relying on *Malloy* v. *Hogan, supra,* at 8, *Spevack* held that the privilege protects individuals against any penalty for their silence and that its protection bars "the imposition of any sanction which makes assertion of the Fifth Amendment privilege 'costly.'" 385 U. S., at 515.[2] See *Griffin* v. *California,* 380 U. S. 609, 614 (1965). *Spevack* expressly stated that "[t]he threat of disbarment and the loss of professional standing, professional reputation, and of livelihood are powerful forms of compulsion," 385 U. S., at 516, and therefore held that by inferring professional misconduct, and penalizing that misconduct, solely on the basis of an invocation of the privilege, the State had violated the Fifth Amendment.

*Gardner* v. *Broderick,* 392 U. S. 273 (1968), involved a policeman called to testify before a grand jury investigating police corruption. He was warned of his constitutional right to refuse to give any incriminating information, but was also asked to waive immunity, and told that if he refused to do so, a state statute required that he be discharged. He refused to waive immunity and was discharged. *Gardner* invalidated the state statute on the ground that the Fifth Amendment does not permit the government to use its power to discharge employees to coerce disclosure of incriminating evidence. *Id.,* at 279. *Sanitation Men* v. *Sanitation Comm'r,* 392

---

[2] Although this quotation is from the plurality opinion of four Justices, Mr. Justice Fortas, who concurred in the judgment, "agree[d] that Spevack could not be disbarred for asserting his privilege against self-incrimination," 385 U. S., at 520, thus providing a majority for that proposition. He wrote separately because he was of the view that state employees enjoyed a lesser protection. He agreed with the result, however, because Spevack—like Palmigiano—was not a state employee. *Ibid.* See *Gardner* v. *Broderick,* 392 U. S. 273 (1968).

U. S. 280 (1968), decided the same day, turned on the same ground.[3]

*Lefkowitz* v. *Turley, supra,* the most recent decision involving noncriminal penalties for exercising the privilege, concerned two architects summoned to testify before a grand jury investigating charges of corruption relating to state contracts. They refused to waive the privilege, and a state statute provided that such a refusal would result in cancellation of existing state contracts and ineligibility for future contracts for five years. The architects brought suit, claiming that the statute violated the privilege against compulsory self-incrimination. The Court held that in the absence of a grant of immunity the government may not compel an individual to give incriminating answers. 414 U. S., at 79.[4] A "substantial economic sanction" in the form of loss of contracts was held sufficient to constitute compulsion within the meaning of the Fifth Amendment. *Id.,* at 82. The penalty, again imposed in a noncriminal context, was held to infringe the Fifth Amendment.

It follows that settled jurisprudence until today has been that it is constitutionally impermissible for the government to impose noncriminal penalties as a means of compelling individuals to forgo the privilege. The Court therefore begs the question by "declin[ing] to extend the

---

[3] In *Sanitation Men* 15 sanitation employees called before the Sanitation Commissioner investigating alleged improprieties were told that a claim of the privilege as a basis for refusing to answer questions concerning their official duties would result in their discharge. Three employees answered and denied the charges, but when later called before grand juries refused to waive immunity and were discharged for doing so. The Court held that to put the employees to a choice between their constitutional rights and their jobs was compulsion that violated the privilege. 392 U. S., at 284.

[4] "[T]he State intended to accomplish what *Garrity* has specifically prohibited—to compel testimony that had not been immunized." 414 U. S., at 82.

*Griffin* rule" to prison disciplinary proceedings, *ante,* at 319. Affirmance of the Court of Appeals' holding that reliance on an inmate's silence is barred by the Fifth Amendment is required by *Spevack, Gardner, Sanitation Men,* and *Lefkowitz.*

The Court's attempted distinction of those cases plainly will not wash. To be sure, refusal to waive the privilege resulted in automatic imposition of some sanction in all of those cases. The Court reasons that because disciplinary decisions must be based on substantial record evidence, *Morris* v. *Travisono,* 310 F. Supp. 857, 873 (RI 1970),[5] and Palmigiano's silence "at the hearing in the face of evidence that incriminated him . . . was given no more evidentiary value than was warranted by the facts surrounding his case," *ante,* at 318, no automatic imposition of a sanction results, and therefore the use of such silence "does not smack of an invalid attempt by the State to compel testimony without granting immunity or to penalize the exercise of the privilege," *ibid.*

But the premise of the *Garrity-Lefkowitz* line was not that compulsion resulted from the automatic nature of the sanction, but that a sanction was imposed that made costly the exercise of the privilege. Plainly the penalty imposed on Palmigiano—30 days in punitive segregation and a downgraded classification—made costly the exercise of the privilege no less than loss of govern-

---

[5] Although *Morris* imposes a substantial-evidence standard for appellate review of findings in disciplinary proceedings, nothing in that case supports the Court's assumption that an inmate's silence alone would not meet this evidentiary standard. *Ante,* at 317; cf. *ante,* at 313 n. 2. But if silence alone provides an evidentiary premise sufficient for discipline, the Court's distinction of the *Garrity-Lefkowitz* cases crumbles. I therefore read the Court's opinion to imply that the Fifth Amendment bars conviction of a disciplinary violation based solely on an inmate's silence. In No. 74–1187, petitioners concede that an inmate's silence, without more, would not be substantial evidence.

ment contracts or discharge from a state job. Even accepting the Court's assertion that a disciplinary conviction does not automatically follow from an inmate's silence, in sanctioning reliance on silence as probative of guilt of the disciplinary offense charged, the Court allows prison officials to make costly the exercise of the privilege, something *Garrity-Lefkowitz* condemned as prohibited by the Fifth Amendment. For it cannot be denied that the disciplinary penalty was imposed to some extent, if not solely,[6] as a sanction for exercising the constitutional privilege. See *Griffin* v. *California, supra; United States* v. *Jackson,* 390 U. S. 570, 581–582 (1968). That plainly violates the Fifth Amendment.

It is inconsequential that the State is free to determine the probative weight to be attached to silence. *Garrity-Lefkowitz* did not consider probative value, and other precedents deny the State power to attach any probative weight whatever to an individual's exercise of the privilege, as I develop more fully in Part IV.

---

[6] As the Court notes, the only evidence, other than Palmigiano's silence, before the Disciplinary Board consisted of written reports made by the prison officials who filed the initial charges against Palmigiano. On the whole, the record inspires little confidence that his silence was not the sole basis for his disciplinary conviction. At the hearing a prison official read the disciplinary charges to Palmigiano and then asked him: "What happened here, Nick?" Palmigiano's response was again to request the presence of counsel, which had previously been denied. When the renewed request was denied, Palmigiano stated that he would remain silent on the advice of counsel. The official thereafter asked: "Do you intend to answer any questions for the board?" Consistent with his earlier statement, Palmigiano replied that he did not. The Board excused him from the hearing room; he was called back within five minutes and informed that he had been found guilty and sentenced to 30 days' punitive segregation, with a possible downgrade in his classification.

The compulsion upon Palmigiano is as obvious as the compulsion upon the individuals in *Garrity-Lefkowitz*. He was told that criminal charges might be brought against him. He was also told that anything he said in the disciplinary hearing could be used against him in a criminal proceeding.[7] Thus, the possibility of self-incrimination was just as real and the threat of a penalty just as coercive. Moreover, the Fifth Amendment does not distinguish among types or degrees of compulsion. It prohibits " 'inducement of any sort.' " *Bram* v. *United States*, 168 U. S. 532, 548 (1897). "We have held inadmissible even a confession secured by so mild a whip as the refusal, under certain circumstances, to allow a suspect to call his wife until he confessed." *Malloy* v. *Hogan*, 378 U. S., at 7. Palmigiano was forced to choose between self-incrimination and punitive segregation or some similar penalty. Since the Court does not overrule the *Garrity-Lefkowitz* group of decisions, those precedents compel the conclusion that this constituted impermissible compulsion.

### III

The Court also draws support from the "prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they re-

---

[7] In this respect it is not clear that all of the *Morris* requirements were observed in Palmigiano's disciplinary hearing. Under the prison's rules, each inmate must be advised that "statements he makes in his defense at a disciplinary hearing are probably not admissible for affirmative use by the prosecution at a trial." Brief for Petitioners in No. 74–1187, pp. 4–5. Palmigiano, however, was told that anything he said could be used against him at a criminal trial. In any event, the uncertain warning required by the prison rules would hardly satisfy constitutional requirements. See n. 8, *infra*. In this respect, the Court's holding that the prisoner has no right to counsel exacerbates the difficulty, for surely the advice of counsel is essential in this complex area. See *Maness* v. *Meyers*, 419 U. S. 449 (1975).

fuse to testify in response to probative evidence offered against them." *Ante,* at 318. That rule may prevail, but it did not have the approval of this Court until today. Some commentators have suggested that permitting an adverse inference in some civil cases violates the Fifth Amendment. Comment, Penalizing the Civil Litigant Who Invokes the Privilege Against Self-Incrimination, 24 U. Fla. L. Rev. 541, 546 (1972); Comment, 1968 U. Ill. L. F. 75; Note, Use of the Privilege Against Self-Incrimination in Civil Litigation, 52 Va. L. Rev. 322 (1966). I would have difficulty holding such an inference impermissible in civil cases involving only private parties. But I would hold that compulsion violating the privilege is present in any proceeding, criminal or civil, where *a government official* puts questions to an individual with the knowledge that the answers might tend to incriminate him. See *Garner* v. *United States,* 424 U. S., at 655–656; *Sanitation Men* v. *Sanitation Comm'r,* 392 U. S., at 284.

Such a distinction is mandated by one of the fundamental purposes of the Fifth Amendment: to preserve our adversary system of criminal justice by preventing *the government* from circumventing that system by abusing its powers. *Garner* v. *United States, supra,* at 655–656. Only a few weeks ago, we said: "That system is undermined when a government deliberately seeks to avoid the burdens of independent investigation by compelling self-incriminating disclosures." *Ibid.*

> "One of the most important functions of the privilege is to protect all persons, whether suspected of crime or not, from abuse by the government of its powers of investigation, arrest, trial and punishment. It was not solicitude for persons accused of crime but the desire to maintain the proper balance between government and the persons governed that

gave rise to the adoption of these constitutional pro-
visions." Ratner, Consequences of Exercising the
Privilege Against Self-Incrimination, 24 U. Chi. L.
Rev. 472, 484 (1957) (footnote omitted).

In a civil suit involving only private parties, no party
brings to the battle the awesome powers of the govern-
ment, and therefore to permit an adverse inference to be
drawn from exercise of the privilege does not implicate
the policy considerations underlying the privilege. But
where the government "deliberately seeks" the answers
to incriminatory questions, allowing it to benefit from
the exercise of the privilege aids, indeed encourages, gov-
ernmental circumvention of our adversary system. In
contrast, an affirmance of the judgment in Palmigiano's
case would further obedience of the government to the
commands of the Fifth Amendment. Cf. *United States*
v. *Karathanos*, 531 F. 2d 26, 35 (CA2 1976) (Oakes, J.,
concurring); Amsterdam, Perspectives on the Fourth
Amendment, 58 Minn. L. Rev. 349 (1974).

Nothing in this record suggests that the State does
not use the disciplinary procedure as a means to gather
evidence for criminal prosecutions. On the contrary,
Palmigiano was told that he might be prosecuted, which
indicates that criminal proceedings are brought in some
instances. And if the State does not intend to initiate
criminal proceedings, the Fifth Amendment problem can
be readily avoided simply by granting immunity for any
testimony given at disciplinary hearings.[8]

---

[8] Although my view is that only transactional immunity can
remove the self-incrimination problem, *Piccirillo* v. *New York*, 400
U. S. 548, 562 (1971) (BRENNAN, J., dissenting), that view is not
presently the law. See, *e. g.*, *Lefkowitz* v. *Turley*, 414 U. S. 70, 84
(1973); *Kastigar* v. *United States*, 406 U. S. 441 (1972).

Although Rhode Island prison officials are not authorized by
statute to grant immunity, my Brother WHITE has suggested that

## IV

I would therefore affirm the judgment of the Court of Appeals in No. 74–1187 insofar as that court held that an inmate's silence may not be used against him in a prison disciplinary proceeding. This would make unnecessary addressing the question whether exercise of the privilege may be treated as probative evidence of guilt. Since the Court, however, indicates that invocation of the privilege is probative in these circumstances, *ante,* at 319, I express my disagreement. For we have repeatedly emphasized that such an inference has no foundation. Indeed, the very cases relied upon by the Court expose its error and support the conclusion that Palmigiano's silence could not be treated as probative.

*United States ex rel. Bilokumsky* v. *Tod,* 263 U. S. 149 (1923), quoted *ante,* at 319, involved a deportation proceeding in which the deportee failed to deny that he was an alien. But he also failed to claim or attempt to prove that he was a citizen. Alienage was not an element of any crime, and his silence was held probative of his

---

a witness who fails to persuade a judge that a prospective answer is incriminatory "is nevertheless protected by a constitutionally imposed use immunity if he answers in response' to the [judge's] order and under threat of contempt." *Maness* v. *Meyers,* 419 U. S., at 474 (concurring in result). See *Fowler* v. *Vincent,* 366 F. Supp. 1224, 1228 (SDNY 1973); *Sands* v. *Wainwright,* 357 F. Supp. 1062, 1093 (MD Fla. 1973). Although an inmate would not be testifying in response to a court order, his answers in response to questions of prison officials are nevertheless compelled within the meaning of the Fifth Amendment. Thus, there would be immunity for any statements given. The inmate must, however, be informed of the existence of the immunity. As my Brother WHITE said, "a witness may not be required to answer a question if there is some rational basis for believing that it will incriminate him, at least without *at that time* being assured that neither it nor its fruits may be used against him." *Maness* v. *Meyers, supra,* at 473 (emphasis in original).

alienage. The inference was plainly permissible since the deportee faced no possibility of incrimination, and there was therefore no implication of the privilege. But Palmigiano's predicament was that answers to the questions put to him by the prison officials could connect him with a crime.

The Court also quotes part of a sentence from *United States* v. *Hale,* 422 U. S. 171 (1975). We said in *Hale* that "[i]n most circumstances silence is so ambiguous that it is of little probative force." *Id.,* at 176. We also noted that its probative force increases where a person "would be more likely than not to dispute an untrue accusation." *Ibid.* We emphasized that "[f]ailure to contest an assertion, however, is considered evidence of acquiescence *only* if it would have been natural under the circumstances to object to the assertion in question." *Ibid.* (emphasis supplied). That was not the case since Hale's silence was in response to notice that he had a right to remain silent, and that any statements he made would be used against him in court. These excerpts from *Hale* require the conclusion that Palmigiano's silence also had no probative force. Palmigiano was also advised that he had a right to remain silent, that he might be prosecuted, and that anything he said could be used against him in court.

Finally, *Grunewald* v. *United States,* 353 U. S. 391 (1957), is particularly persuasive authority that Palmigiano's silence is not probative. We there considered whether one Halperin's exercise of the privilege was probative of guilt, and we concluded that his silence, in the circumstances, was "wholly consistent with innocence." *Id.,* at 421. "Halperin repeatedly insisted . . . that he was innocent and that he pleaded his Fifth Amendment privilege solely on the advice of counsel." *Id.,* at 422. Similarly, Palmigiano here maintained that he was innocent and that he claimed the privilege on

338

the advice of counsel. *Grunewald* was a situation where "the Fifth Amendment claim was made before a grand jury where Halperin was a compelled, and not a voluntary, witness; where he was not represented by counsel; where he could summon no witnesses; and where he had no opportunity to cross-examine witnesses testifying against him." *Ibid.* That was similar to Palmigiano's situation; inmates have only a very limited right to call witnesses, and an even more limited right of cross-examination, *ante,* at 321–322. *Grunewald* is thus most persuasive authority that Palmigiano's silence was not probative. See *Flint* v. *Mullen,* 499 F. 2d 100, 103 (CA1), cert. denied, 419 U. S. 1026 (1974).[9]

To accord silence probative force in these cases overlooks the hornbook teaching "that one of the basic functions of the privilege is to protect *innocent* men." *Grunewald* v. *United States, supra,* at 421 (emphasis in original). If this Court's insensitivity to the Fifth

---

[9] The other cases cited by the Court likewise do not support a holding that Palmigiano's silence should have probative force. No self-incrimination problem was presented in *Gastelum-Quinones* v. *Kennedy,* 374 U. S. 469 (1963). That case involved a deportation proceeding, and the subject of that proceeding remained silent, but not for Fifth Amendment reasons. Moreover, the Court held that "deportation is a drastic sanction" and "must therefore be premised upon evidence . . . more directly probative than a mere inference based upon the alien's silence." *Id.,* at 479. We held that particular deportation order not based on substantial evidence. *Id.,* at 480. Similarly, the Court did not address any self-incrimination issue relevant to the instant case in *Adamson* v. *California,* 332 U. S. 46 (1947), and *Twining* v. *New Jersey,* 211 U. S. 78 (1908). Those cases were based on the premise, overruled in *Malloy* v. *Hogan,* 378 U. S. 1 (1964), that the Fifth Amendment protection against self-incrimination was not applicable to the States. Finally, whether *Raffel* v. *United States,* 271 U. S. 494 (1926), remains law is subject to much doubt. See *United States* v. *Hale,* 422 U. S. 171, 175 n. 4 (1975); *United States* v. *Grunewald,* 233 F. 2d 556, 575 (CA2 1956) (Frank, J., dissenting), rev'd, 353 U. S. 391 (1957).

Amendment violation present in this case portends still more erosion of the privilege, state courts and legislatures will remember that they remain free to afford protections of our basic liberties as a matter of state law. See *Michigan* v. *Mosley*, 423 U. S. 96, 120–121 (1975) (BRENNAN, J., dissenting). Contrary to this Court's interpretation of the Federal Constitution's privilege against compulsory self-incrimination in *Harris* v. *New York*, 401 U. S. 222 (1971), the California Supreme Court recently construed California's constitutional prohibition to forbid use of an accused's inculpatory statement obtained in violation of custodial interrogation safeguards announced in *Miranda* v. *Arizona*, 384 U. S. 436 (1966). The co··rt said, *People* v. *Disbrow*, 16 Cal. 3d 101, 113–115, 545 P. 2d 272, 280 (1976): "We . . . declare that *Harris* is not persuasive authority in any state prosecution in California. . . . We pause . . . to reaffirm the independent nature of the California Constitution and our responsibility to separately define and protect the rights of California citizens despite conflicting decisions of the United States Supreme Court interpreting the federal Constitution." [10]

---

[10] Other state courts have also rejected *Harris* as a matter of state constitutional law. *Commonwealth* v. *Triplett*, 462 Pa. 244, 341 A. 2d 62 (1975); *State* v. *Santiago*, 53 Haw. 254, 492 P. 2d 657 (1971). In addition, admission of incriminating statements for impeachment purposes can be prohibited by statute notwithstanding the decision in *Harris*. *Butler* v. *State*, 493 S. W. 2d 190 (Tex. Crim. App. 1973). See *United States* v. *Jordan*, 20 U. S. C. M. A. 614, 44 C. M. R. 44 (1971). Finally, it should be noted that there need not be a state constitutional counterpart to the Fifth Amendment or a specific statutory prohibition to reach this result; use of incriminating statements can be prohibited by a state court as a matter of public policy in that State. See *In re Pillo*, 11 N. J. 8, 93 A. 2d 176 (1952); *State* v. *Miller*, 67 N. J. 229, 245 n. 1, 337 A. 2d 36, 45 n. 1 (1975) (Clifford, J., concurring in part and dissenting in part).

The fact that Palmigiano is a prison inmate cannot, of course, distinguish this case from the cases in the *Garrity-Lefkowitz* line, since "a prisoner does not shed his basic constitutional rights at the prison gate." *Wolff* v. *McDonnell,* 418 U. S., at 581 (MARSHALL, J., dissenting); see *Jackson* v. *Bishop,* 404 F. 2d 571, 576 (CA8 1968) (Blackmun, J.). I must therefore view today's decision as another regrettable disregard of Mr. Justice Frankfurter's admonition that our interpretation of the privilege is not faithful to the Founding Fathers' purpose when it does not reflect the teaching of history:

> "This command of the Fifth Amendment . . . registers an important advance in the development of our liberty—'one of the great landmarks in man's struggle to make himself civilized.' Time has not shown that protection from the evils against which this safeguard was directed is needless or unwarranted. This constitutional protection must not be interpreted in a hostile or niggardly spirit. Too many, even those who should be better advised, view this privilege as a shelter for wrongdoers. They too readily assume that those who invoke it are either guilty of crime or commit perjury in claiming the privilege. Such a view does scant honor to the patriots who sponsored the Bill of Rights as a condition to acceptance of the Constitution by the ratifying States." *Ullmann* v. *United States,* 350 U. S. 422, 426–427 (1956) (footnotes omitted).