*265 OPINION OF THE COURT
Martin Shulman, J.
In the context of a drug holdover proceeding, this pretrial round of motion practice raises an issue of first impression. The respondent, Gregory Dawson (Dawson or respondent), has made a motion seeking a stay of this proceeding (CPLR 2201)[1] pending the prosecution of a concomitant criminal action against him. Both matters allegedly involve the respondent’s repeated sales of methamphetamine (Ice or drugs or methamphetamine). The basis for the stay centers on respondent’s concern that if he is forced to go to trial in this summary proceeding “while criminal charges arising out of the same conduct [are] pending [he will be] forced * * * to choose between preserving his fifth amendment privilege and losing the civil suit” (United States v White, 589 F2d 1283, 1286 [5th Cir 1979]). The petitioner, 54 West 16th Street Apartment Corp. (the Co-op or petitioner), opposes the motion.
BACKGROUND
The respondent entered into possession of a cooperative apartment known as 14-B (Apartment) located at 54 West 16th Street, New York, New York (Building), on June 29, 1983. Dawson and his corespondent Thomas Barry (Barry)[2] are proprietary lessees.
By letter dated June 15, 1998, the New York County District Attorneys office advised the Co-op that “the New York City Police Department executed a search warrant in the * * * [Apartment] * * * the search warrant produced evidence that the * * * [Apartment was] being used for the illegal business of selling narcotics”. Said office requested petitioner to commence an illegal use holdover proceeding against Dawson pursuant to Real Property Law § 231 and RPAPL 711 and 715. The peti *266 tion recites over 15 instances where Dawson sold drugs to an undercover officer:
“(A) At approximately 8:00 p.m., September 9, 1997, following a telephone conversation between the undercover officer and Dawson, the undercover officer went to the premises. Inside the apartment, Dawson handed the undercover officer two bags containing methamphetamine in exchange for U.S. currency.
“(B) At approximately 9:10 p.m., September 12, 1997, the undercover officer again went to the premises following a telephone conversation with Dawson who gave him one bag of methamphetamine in exchange for U.S. currency.
“(C) On September 18, 1997, the undercover officer again spoke with Dawson on the telephone. At 4:20 p.m. that day, the undercover officer went to the premises where Dawson handed him two bags of methamphetamine in exchange for U.S. currency.
“(D) At approximately 10:45 p.m., September 23, 1997, following a telephone conversation between Dawson and the undercover officer, the officer went to the premises. Dawson gave the undercover officer two bags of methamphetamine in exchange for U.S. currency.
“(E) Following a telephone conversation between Dawson and the undercover officer on September 26, 1997, at 10:00 [p.m.], the officer went to the premises where Dawson again gave the undercover officer a bag of methamphetamine for U.S. currency.
“(F) On October 3, 1997, the undercover officer again telephoned Dawson. At approximately 10:55 p.m., the undercover officer went to the premises and Dawson sold him one-eighth of an ounce of methamphetamine.
“(G) At approximately 6:05 p.m., October 9, 1997, the undercover officer again went to the premises after having a telephone conversation with Dawson purchased from defendant two bags of methamphetamine * * *
“(I) On October 28, 1997, the undercover officer again telephoned Dawson. Following their conversation, at approximately 9:20 p.m., the undercover officer proceeded to the premises where Dawson sold him over one-half an ounce of methamphetamine.
“(J) At approximately 10:30 p.m., December 2, 1997, after speaking with Dawson by telephone, the undercover officer went to the premises and purchased from Dawson one-eighth ounce of methamphetamine.
*267 “(K) At approximately 9:15 p.m., December 17, 1997, the undercover officer went to the premises following a telephone conversation with Dawson. At that time, Dawson handed the undercover officer over one-eighth ounce of methamphetamine in exchange for U.S. currency.
“(L) On January 8, 1998, at approximately 10:30 p.m., after speaking with Dawson by telephone, the undercover officer again went to the premises. The undercover officer told Dawson that he wanted four whole grams of methamphetamine, Dawson entered the kitchen and began scooping crystal methamphetamine out of a clear plastic bag into a cup which was on the digital scale on the counter. Dawson weighed out four whole grams and emptied the cup into a clear ziplock bag. Dawson handed the undercover officer the bag of methamphetamine in exchange for $800.
“(M) On February 11, 1998, the undercover officer again had a telephone conversation with Dawson. At approximately 9:10 p.m., the undercover officer arrive[d] at the apartment and again asked Dawson for four whole grams of methamphetamine. The officer observed Dawson weigh out four grams of crystal methamphetamine which he removed from a box on the kitchen counter. Dawson then placed the methamphetamine inside a clear plastic bag and handed it to the undercover officer in exchange for $800.
“(N) At approximately 9:45 p.m., February 17, 1998, after speaking with Dawson by telephone, the undercover officer went to the apartment. The undercover officer asked Dawson for four whole grams of methamphetamine. Dawson weighed out four grams on the digital scale and placed the methamphetamine into a ziplock bag in exchange for $800.
“(O) At approximately 10:20 p.m., February 19, 1998, following a telephone conversation between Dawson and the undercover officer, the officer arrived at the apartment. He purchased from Dawson one-eighth of an ounce of methamphetamine.
“(P) On March 19, 1998, the undercover officer again telephoned Dawson. After that conversation, at approximately 8:40 p.m., the officer proceeded to the apartment where Dawson sold him over one-eighth of an ounce of methamphetamine.”[3]
*268 THE STAY REQUEST
Dawson’s attorneys* **[4] essentially characterize the underlying proceeding as State action and that the District Attorney’s office, “behind the scenes”, is posing a coercive threat of eviction, if respondent seeks to invoke the privilege against self-incrimination otherwise guaranteed under the Fifth and Fourteenth Amendments of the United States Constitution as well as article I, § 6 of the New York State Constitution.
In opposing the motion, the Co-op’s attorneys point out that if Dawson “voluntarily testifies at the trial of this proceeding, his incriminating testimony will be used against him. As a result, Dawson fears that the plea bargain he is negotiating * * * will fall through. Thus, Dawson * * * [seeks] a stay of this proceeding because he is more concerned with ‘getting off easy’ than for the safety and well-being of the other residents of the building, many of whom are children, and who are being placed in jeopardy by Dawson’s dangerous, self-indulgent and thoughtless conduct.” (Skaller affidavit in opposition 4.)
DISCUSSION
As a general rule, the Civil Court has the discretion to stay a summary proceeding pending the outcome of related litigation provided there is an identity of parties, causes of action and remedies being sought. There is no question that the prosecution of the criminal action and the instant holdover proceeding are not identical, inter alia, with respect to burdens of proof and respondent’s respective exposure in each type of case. (Pleasant E. Assocs. v Soto, NYLJ, Oct. 27, 1993, at 26, col 3 [Civ Ct, NY County, Diamond, J.].) Judge Diamond further elucidated this point by stating that: “[t]he purpose of illegal use evictions under RPAPL sections 711 and 715 * * * is not to provide an additional penalty for criminal behavior. It is to protect the inhabitants of communities from prostitution, gambling and drug dealing. RPAPL section 715(2), enacted in 1962, specifically targeted prostitution. RPAPL section 715(3), enacted in 1980, targeted gambling. Today, the overwhelming *269 majority of illegal use proceedings brought under RPAPL sections 711 and 715 arise out of the drug trade, whose detrimental effects on communities, families and lives is well documented. Furthermore, a criminal court determination that the criminal law had not been violated would be irrelevant to this court’s determination of the issues before it, since Petitioner here need only prove by a preponderance of the evidence that it is entitled to possession of the premises.” (Supra, at 26, col 4 [emphasis added].) Put differently, “to assert a valid claim pursuant to RPAPL 711(5) petitioner need not prove the commission of the specific illegal acts. Rather all that is necessary is that the acts and conduct proven warrant an inference that the premises were being used [‘for any illegal trade or manufacture, or other illegal business’ (RPAPL 711 [5])]” (New York City Hous. Auth. v Manley, NYLJ, Jan. 8, 1997, at 26, col 2 [Civ Ct, NY County, Gische, J.]).
The instant issue as framed by the Fifth Circuit in White (supra) was addressed by the United States Supreme Court in Baxter v Palmigiano (425 US 308 [1976]). In Baxter, a prison inmate, subject to a disciplinary proceeding, challenged a State rule permitting the Hearing Officer to draw a negative inference from his failure to testify in derogation of his Fifth Amendment privilege against self-incrimination. The United States Supreme Court found no constitutional infirmity. The Court distinguished Baxter from a line of cases which held that “the State could not constitutionally seek to compel testimony that had not been immunized by threats of serious economic reprisal” (425 US, at 317 [e.g., by operation of law, a respondent’s silence standing alone, without regard to other evidence, automatically triggered a forfeiture of public employment, disbarment, cancellation of State contracts, etc.]). The Baxter Court reasoned that the inmate “remained silent at the hearing in the face of evidence that incriminated him; and, as far as this record reveals, his silence was given no more evidentiary value than was warranted by the facts surrounding his case. This does not smack of an invalid attempt by the State to compel testimony without granting immunity or to penalize the exercise of the privilege.” (Supra, at 318.)
Basically, petitioner’s prima facie case will consist of the pedestrian elements of establishing the landlord-tenant relationship and other ministerial requisites (see generally, RPAPL 741). Of course, the proof of the illegal trade of Ice and/or other illegal drugs will invariably rest on the testimonial evidence of an appropriate witness and admissible documentary evidence. *270 What is clear from the Baxter ruling is that there can be no automatic forfeiture of Dawson’s proprietary lease resulting from his silence. In reply correspondence, Dawson’s counsel makes much of the possibility that the petitioner could force respondent to testify to prove all the elements of his prima facie case. Preliminarily, Dawson can never be forced to waive his Fifth Amendment privilege which is fully preserved even in a civil action or proceeding. (Matter of Siegel v Crawford, 292 NY 651 [1944].) Moreover, respondent “overstates his dilemma * * * [that he may be] forced to surrender his privilege against self-incrimination in order to prevent a [possessory] judgment against him; although he [might be] den[ying] his most effective defense by remaining silent, there is no indication that invocation of the fifth amendment [will] necessarily result [] in an adverse judgment” (United States v White, 589 F2d, supra, at 1286). Again, the New York rule is that a party’s assertion of the Fifth Amendment privilege in a civil case may be considered by a Judge or jury in assessing the strength of the evidence offered by the opposing party if the party-witness is capable of meaningfully controverting same. (Marine Midland Bank v Russo Produce Co., 50 NY2d 31 [1980].)[5]
As stated earlier, if Dawson chooses to testify at his trial in the instant case, he may never be forced to answer any question which would have an incriminating effect. (See, Carroll v Price, 144 Misc 2d 837 [Sup Ct, Suffolk County 1989] [Lama, J.].) Respondent, if he chooses, will be free to offer any exculpatory testimonial evidence as well as present other witnesses and/or forensic evidence to rebut the inference of an illegal trade or business.
Undoubtedly, Dawson will have to make a difficult choice between his right to testify in his defense during the drug holdover trial or assert his Fifth Amendment privilege and remain silent. Being forced to make this choice is difficult but it is not unconstitutional. (Matter of Vance A., 105 Misc 2d 254 [Fam Ct, NY County 1980] [Dembitz, J.].)
Accordingly, respondent’s motion to stay the proceeding is denied and the matter shall go forward to trial on October 5, 1998 at 9:30 a.m.

. On the September 16, 1998 return date of this motion, respondent’s counsel advised this court that Dawson’s defense counsel had just made a Clayton motion for dismissal of the indictment (two A-II felony charges) in the interest of justice pursuant to CPL 210.40 (see, People v Clayton, 41 AD2d 204 [2d Dept 1973]). Although no proof was offered in respondent’s motion papers or at the bench conference, much was made of Dawson currently being in the advanced stages of AIDS which, in and of itself, may not necessarily result in the dismissal of the indictment. (People v Pender, 156 Misc 2d 325 [Sup Ct, Queens County 1992] [Corrado, JJ; but see, People v Herman L., 83 NY2d 958 [1994].)

. Admittedly, Barry has never resided at the Apartment and was (and is) not the subject of any prosecution for the illegal acts alleged to have occurred therein.

. Pursuant to a search warrant, the police searched the Apartment on or about April 17, 1998, and, inter alia, retrieved approximately $30,000 in cash, assorted pills, over two ounces of Ice from the kitchen and living room *268 and assorted drug paraphernalia. As stated supra, on April 24, 1998, a Special Grand Jury indicted respondent on felony charges for criminal possession and sale of controlled substances as well as 21 other charges related to such alleged criminal conduct.

. Issue has been joined as both Dawson and Barry have interposed answers. However, Dawson’s motion does not contain any affidavits or supporting documentation to even hint to any factual allegation that may prove to severely prejudice Dawson’s defense of the criminal action.

. In Marine Midland {supra), the Court of Appeals declined to extend the Griffin rule in civil cases (prohibition against a “judge and prosecutor from suggesting to the jury that it may treat the defendant’s silence as substantive evidence of guilt” [Baxter v Palmigiano, 425 US, supra, at 319; see, Griffin v California, 380 US 609 (1965)]).