OPINION OF THE COURT
Nanette Dembitz, J.
The child abuse petition herein, filed by the New York City Commissioner of Social Services under article 10 of the Family Court Act for the protection of six-year-old Vance, alleges that Vance is in danger of serious physical *255 injury by respondent, his mother, in that she caused the death of his year-old brother by purposely inflicting burns on 95% of his body,[1] and in the same incident inflicted milder burns on Vance. When the case came on for trial to determine the truth of the allegations, respondent was incarcerated under an indictment for the murder of Vance’s brother, and Vance was in temporary foster care pursuant to the commissioner’s emergency child-removal power.
Respondent’s assigned counsel, moving for an indefinite adjournment of trial, contended that her constitutional privilege against self incrimination would be violated if the child abuse trial were held before the termination of the criminal case against her. Acceptance of this contention would render unconstitutional the Family Court Act’s provision for Family Court proceedings concurrent with or prior to criminal litigation concerning the same underlying acts (Family Ct Act, § 1013, subd [b] ; § 1014, subd [c]). Both petitioner Commissioner and the Legal Aid attorney appointed to represent the child Vance, opposed respondent’s position; they pointed out that postponement until the conclusion of the criminal case would inevitably be lengthy because it had not even progressed to a hearing on respondent’s alleged incompetence to stand trial.
While a motion by respondent for indefinite adjournment is frequent in Family Court child protective cases when criminal proceedings are also pending,[2] the issue as to the *256 privilege against self incrimination presented by such motions has not been the subject of a published opinion or appellate review; and such motions have met with different results before different Trial Judges. Though there is no controlling authority on the constitutionality of concurrent civil and criminal trials based on the same underlying acts (see notes 4 and 5 below), this court concludes on the basis of doctrines developed by the appellate courts in other contexts that the Family Court Act’s provision for such trials is constitutional, and that respondent’s child abuse trial before the conclusion of the related criminal prosecution does not violate her privilege against self incrimination (Point I below). As an alternate ground for decision, it is concluded that the Family Court Act’s provision for “testimonial immunity” regarding criminal prosecution authorizes the Family Court to accord respondent all the protection from self incrimination to which she is constitutionally entitled. (Point II below.) Finally, the court rejects respondent’s argument that child abuse proceedings are controlled by the criminal law rule prohibiting an individual’s trial while mentally incompetent (Point III below.) Despite some similarity to a criminal proceeding, a child abuse case is governed by the civil rule that a trial may be held if a guardian ad litem is appointed for an incompetent party (CPLR 1201).
I. IMPACT OF PRIVILEGE AGAINST SELF INCRIMINATION IN CHILD-PROTECTIVE PROCEEDING
The argument that respondent’s constitutional privilege against self incrimination would be violated by her trial for child abuse during the pendency of her criminal prosecution, rests on this fact: in order for her to give testimony in defense or partial exculpation in the Family Court proceeding she would be forced to risk the use of such testimony against her in the criminal prosecution. The pos *257 sibility of such self incrimination through testimony intended as exculpation, must be recognized; for even a defendant’s admission that he knew a guilty person might “link” him with a crime despite his innocence. (Grunewald v United States, 353 US 391, 422.) See also Baxter v Palmigiano (425 US 308, 327 [Brennan, J., dissenting in part]), pointing out that “an innocent person * * * [may fear] that revelation of information would tend to connect him with a crime he did not commit”. And prosecutorial use of any testimony by respondent herein must be viewed as a realistic risk, considering the District Attorney’s frequent efforts to secure transcripts of the testimony in child abuse cases.
The risks and choices confronting respondent by a forthwith child abuse trial must therefore be evaluated in the light of the privilege against self incrimination, for the privilege prohibits any agency of government from imposing “a price for asserting it * * * [It] ‘guarantees * * * the right of a person to remain silent unless he chooses to speak * * * and to suffer no penalty . . . for such silence’ * * * In this context ‘penalty’ * * * means * * * the imposition of any sanction which makes assertion of the Fifth Amendment privilege ‘costly.’ ” (Spevack v Klein, 385 US 511, 514-515.)[3] Thus, the question at bar comes down to this: is it an unconstitutional price or sanction within the Supreme Court’s meaning, to force respondent to choose between foregoing her right to testify in the child abuse trial or risking self incrimination in the criminal prosecution?[4] As *258 the highest court of another State recently commented in an analogous situation — a probation revocation hearing concurrent with a criminal prosecution for the same underlying act, “there is no clear standard for determining what choices constitute a penalty”[5] and determination of the instant case thus requires analysis of several lines of authority.[6]
A. SANCTIONS ON THE EXERCISE OF THE PRIVILEGE AGAINST SELF INCRIMINATION
In a series of decisions the United States Supreme Court held that an individual cannot be forced to choose between the risk of self incrimination and the loss of public employment (Gardner v Broderick, 392 US 273; Sanitation Men v Sanitation Comr., 392 US 280; Garrity v New Jersey, 385 US 493). Nor can he be confronted with the option between the risk of self incrimination or disbarment (Spevack v Klein, 385 US 511), or disqualification from holding and obtaining contracts for public work (Lefkowitz v Turley, 414 US 70), or loss of office in a political party (Lefkowitz v Cunningham, 431 US 801, 806). Statements in these decisions as to “ ‘the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will’ ” (Spevack, 385 US, at p 514), would, if read literally, embrace and invalidate the conduct of the instant child abuse trial prior to the termination of the criminal proceed *259 ings against respondent. For, her “free choice to speak out or to remain silent” (Garrity, 385 US, at p 497), about the charged crime would be affected by the fact that her silence would cost her her opportunity to defend herself against the allegations of child abuse. However, the foregoing Supreme Court dicta must be read cautiously. In fact, in each of the above cases a respondent or defendant’s choice against testifying and risking self incrimination resulted in a direct and automatic loss of a benefit, and there appears to be no United States Supreme Court decision invalidating a less drastic consequence.
Thus, in a direction contrary to the above decisions the court held in Baxter v Palmigiano (425 US 308, supra) that it was constitutional to draw an adverse inference from a defendant’s silence in a prison disciplinary proceeding even though it resulted in his punitive segregation and downgrading of his classification status. Partly because there was no automatic damage to defendant from his silence, the court said that the procedure “does not smack of an invalid attempt by the State to * * * penalize the exercise of the privilege” (Baxter, 425 US, at p 318); the majority rejected the dissenting view that the result was “to make costly the exercise of the privilege” by offering respondent an “ ‘inducement’ ” to forego it (Baxter, 425 US, at pp 332-333, Brennan, J., dissenting in part).
Baxter (supra) is a strong precedent for the constitutionality of the choice confronting respondent in the instant case. There not only was a loss of personal liberty at stake, but also it was a likely consequence of the negative value attached to defendant’s silence; here a liberty loss to respondent if she chooses silence is speculative, depending on the strength of petitioner’s evidence.[7] And in Marine Midland Bank v Russo Produce Co. (50 NY2d 31, 42) the *260 Court of Appeals, citing Baxter, recently held constitutional a forced choice between self incrimination or an adverse inference as to civil liability (albeit that the liability was only for money damages).
B. “DIFFICULT choices” and public policy
Thus, the choice imposed on respondent by a forthwith child abuse trial between the right to testify therein and the right against self incrimination, appears to fall in the category of choices that are constitutional although difficult. McGautha v California (402 US 183) lends strong support to the constitutionality of the choice confronting respondent. In McGautha, the court upheld, against a claim of violation of the privilege against self incrimination, the State’s unitary trial procedure although it forced a defendant in a murder trial to choose between taking the stand in his defense on the merits and thereby opening the door to possibly damaging testimony, or foregoing his opportunity to testify against his sentence to death (402 US, at pp 209-210, 213). See also Jenkins v Anderson (447 US 231, 236) as to a choice “ ‘that has the effect of discouraging the exercise of constitutional rights.’ ”
Furthermore, public policy, which must be considered in determining whether the “imposition of these difficult choices” is constitutional (see Chaffin v Stynchcombe, 412 US 17, 31),[8] supports constitutionality herein, for the prompt conclusion of child abuse proceedings is essential to child welfare. (See People v Kenyon, 46 AD2d 409, 412.) Expedition is important because it is only if and after the allegations of abuse are' sustained at a fact-finding trial that the Family Court has authority to determine, the best plan for the child’s long-term care. (Family Ct Act, §§ 1045, 1047, 1052). However, criminal charges based on acts of alleged child abuse generally pend for inordinate periods.
Frequently such criminal cases are dismissed because of the impossibility of mustering proof beyond a reasonable *261 doubt as to guilt for injuries a child suffers at home.[9] But such dismissals are long delayed due to the prosecutor’s understandable reluctance to abandon a case when a child has died or been seriously injured according to hospital or autopsy reports as the result of unexplained blows, burns, or wounds. Thus, a practice of adjourning child abuse proceedings because of the pendency of a criminal prosecution against a parent, customarily results in adjournments for many months, with the child in temporary residences in the interim; he is thus deprived, during a life-crisis, of care by relatives or others who can give him a sense of lasting love, nurture, and security.[10] Accordingly, though Vance is in foster care and respondent is incarcerated, the argument of respondent’s counsel as to the unimportance from a public policy standpoint of a forthwith trial in the instant abuse case, is unpersuasive. The child’s welfare requires a long-term plan for stable loving care by a substitute parent if respondent is an unfit mother, and an abuse trial is the essential first step for such planning.
In sum, a civil trial for child abuse prior to the termination of the murder prosecution against respondent means that she cannot testify in her defense in the Family Court case without risking self incrimination on the murder charge. However, the doctrines developed by the United States Supreme Court and the New York Court of Appeals —albeit in other contexts — show that such a procedure does *262 not impose an unconstitutional penalty upon her constitutional privilege against self incrimination. Burdening respondent with the difficult choice between her right to testify and her right to silence is justified by profound considerations of public policy. To delay the child abuse trial for the period required to resolve the criminal case would leave Vance’s care, and the need to remake this six-year-old child’s life, in a suspended state for many months and prevent for an incalculable time the long-term planning essential for his welfare.
II. FAMILY COURT ACT’S PROVISION FOR “testimonial immunity”
Subdivision (d) of section 1014 of the Family Court Act authorizes a Family Court Judge to accord a respondent in a child neglect or abuse case “testimonial immunity in any subsequent criminal court proceeding.” Assuming arguendo (contrary to the reasoning in point I above) that respondent’s constitutional privilege against self incrimination would be violated by trial of the child abuse petition during the pendency of her criminal prosecution, subdivision (d) of section 1014 supplies an alternative ground for decision that a concurrent trial is constitutional, for it authorizes the grant of all the protection of the privilege against self incrimination to which a respondent is constitutionally entitled.
The privilege against self incrimination protects a witness against “use of the * * * testimony and evidence derived therefrom” in a criminal prosecution; he can be induced to testify only if he is accorded “use and derivative-use immunity.” (Kastigar v United States, 406 US 441, 458, see, also, pp 452, 454, reh den 408 US 931.) While the term used in the Family Court Act — “testimonial immunity” — does not figure either in the criminal or civil procedure laws (see CPU 50.10, subd 1; CPLR 4501), and its interpretation appears to be a question of first impression, it should in view of its historical context be interpreted as covering derivative use of a respondent’s testimony as well as the testimony itself..
At the time of the enactment of the Family Court Act’s *263 immunity provision, the Supreme Court had recently established the use and derivative-use standard reaffirmed in Kastigar (supra); concomitantly it rejected the view, which had been suggested by its earlier decisions, that the constitutional privilege required a grant of “transactional immunity” which immunizes a witness from prosecution for the act concerning which he testifies.[11] It is clear that the Legislature was well aware of the constitutional controversy and intended to authorize an immunity corresponding with the reach of the constitutional privilege under the later Supreme Court decisions. Such an intent is apparent from the legislative departure from the well-established transactional immunity model included in the CPL, which law provides for a person’s immunity from conviction for any offense or subjection to any penalty “for or on account of any transaction, matter or thing concerning which he gave evidence” (CPL 50.10, subd l).[12] Thus any ambiguity as to whether the Family Court Act’s provision for “testimonial” immunity includes immunity from derivative use should be resolved in favor of the inclusive construction. And in order to implement the legislative intent to authorize a grant of immunity as broad as the privilege, the Family Court Act’s authorization for “testimonial immunity in any subsequent criminal court proceeding” (Family Ct Act, § 1014, subd [d]) should be read as applying to any subsequent use of testimony whether in a concurrent proceeding as in the instant case or a subsequent one.
*264 The court has offered respondent the immunity provided by the Family Court Act (as construed above), in order to dispose of any possible objection on grounds of the privilege against self incrimination to proceeding with the child abuse trial during the pendency of the criminal prosecution. “If the witness * * * is granted immunity against the use of his testimony and its fruits in a later prosecution, our cases hold that the danger of self-incrimination is removed and the privilege wholly satisfied,” (Maness v Meyers, 419 US 449, 473 [White, J. concurring]). Indeed, in order to alleviate any unfairness to respondent and to encourage her to testify so that this court will be as well informed as possible,[13] the court has also offered tó seal the record of her testimony against all but appellate use.[14] While it is true that adjournment of the instant proceeding until termination of the criminal case would remove any residual fear on respondent’s part of testifying herein, expedition in child abuse proceedings is too important, for the reason stated above, to permit of an adjournment that is not legally required.[15]
III. respondent’s incompetence to stand trial
Respondent’s attorney argues that the child abuse proceedings against respondent must be indefinitely adjourned because of her incompetence to stand trial. Pointing out that the psychiatric reports submitted to the criminal court subscribe to her mental illness and incompetence, respondent contends that this court must follow criminal procedure and postpone trial on the instant child abuse petition until she regains competence.[16] If — contrary to re *265 spondent’s contention, — civil procedure applies herein, the only requirement for the trial of an incompetent is the appointment of a guardian ad litem (CPLR 1201).
The Family Court Act provides for a civil format in all proceedings thereunder and for application to them of CPLR when “appropriate” (Family Ct Act, § 165). However, in support of respondent’s position it must be noted that one type of Family Court case — juvenile delinquency —has been held quasi-criminal and a number of the provisions of the CPL have been held applicable thereto.[17] In addition, the Court of Appeals ruling that counsel must be assigned to an indigent parent in Family Court child-protective proceedings because a “fundamental” personal interest is at stake (Matter of Ella B., 30 NY2d 352, 356-357), distinguishes such cases from ordinary civil litigation in which no assignment is required.[18] Nevertheless, it is concluded for the reasons below that child neglect or abuse proceedings are governed by the civil rule, and that appointment of a guardian ad litem will permit the instant case to proceed.
While the courts have not addressed the issue raised by respondent as to the application in child-protective cases of the criminal rule regarding competency, the suitability of civil procedure therein has been assumed in appellate decisions. Thus, Matter of Daniel A. D. (49 NY2d 788) concerned the permanent termination of a mother’s right to custody because of her mental illness and the child’s consequent freedom for adoption — a more drastic remedy than that at stake for respondent in the case at bar. In remanding the case to the Family Court for further trial on the mental illness issue, the Court of Appeals suggested the advisability of protection of “the mother’s interests * * * by the appointment of a guardian” pursuant to CPLR 1201 (49 NY2d, at pp 790-791). (See, also, Matter of Carmen G.F., 63 AD2d 651.) Indeed, considering the likelihood of *266 incompetence as a concomitant of mental illness,[19] the recognition of mental illness as a ground for termination of parental rights indicates in itself that incompetent is, as in other civil cases, no bar to a child-protective proceeding.
It is true that the Ella B. rule as to the assignment of counsel to an indigent parent smacks of an alignment of child protective proceedings with criminal cases, where such assignment is constitutionally mandated.[20] However, the Court of Appeals has also required assignment of counsel to another type of civil litigant — to an inmate of a mental hospital in a habeas corpus case for his release. (People ex rel. Rogers v Stanley, 17 NY2d 256.)[21] But despite the special protection thus accorded in cases involving retention in mental hospitals, it has never been doubted that a mental commitment proceeding is valid though its subject may be incompetent as well as mentally ill.[22]
The approach in the mental illness field points the way appropriate herein: Special safeguards, compared to those in ordinary civil proceedings, are accorded on a selective basis; although the basic constitutional right to physical liberty is at stake,[23] there is no over-all departure from civil rules. (And see Boddie v Connecticut, 401 US 371, 383, 384-385 [Douglas, J. concurring] where indigent petitioners in divorce proceedings were analogized to indigent criminal defendants for the limited purpose of extending to them the right to waiver of a filing fee.) Using the standard indicated in Addington v Texas (441 US 418) *267 as to whether a criminal protection should be accorded in a civil case, it appears clearly inappropriate to import the criminal rule on incompetency into a child abuse proceeding.
In Addington (supra) the Supreme Court held that a commitment for mental illness required a higher quantum of proof than customary civil cases but less than the criminal standard of proof beyond a reasonable doubt. The court rejected the criminal rule because of the difference between criminal and commitment proceedings from the standpoint of the “interests at stake * * * the individual’s interest * * * and the state’s interest” (441 US, at pp 424-425). A “reasonable doubt standard”, the court said, “is inappropriate in civil commitment proceedings because * * * it may * * * erect an unreasonable barrier to needed medical treatment” (441 US, at p 432).
Applying this approach to the instant case, a differentiation from a criminal prosecution, similar to that in Adding-ton (supra), must result. The principle that a criminal defendant can not be tried unless he is competent is consistent with the criminal justice goal of protection of the public, since he can be institutionalized pending trial; contrariwise, the goal of child protective proceedings — according the child appropriate substitute care if his parent is unfit, cannot be achieved without a trial of the parent’s fitness. Thus, in regard to whether the civil or criminal rule on competence should apply in such a proceeding, the basic purpose of the Family Court Act “to establish a civil, remedial mechanism” must be controlling (see United States v Ward, 448 US 242, —, 48 USLW 4926, 4928, holding that criminal protections were inapplicable in the civil action before the court because of its remedial nonpunitive purpose, despite its similarity in some respects to a criminal proceeding.) There is no room for doubt that the purpose of the instant child protective proceedings is remedial rather than punitive; indeed, an authorized outcome even after an abuse finding, is return of the child to the mother with services in the home to help her care for him. (Family Ct Act, § 1052, subd [a], par [ii]; §§ 1054,1055, subd [c].)
In sum, despite the involvement herein of respondent’s “fundamental” interests and her consequent right to as *268 signed counsel (Matter of Ella B, 30 NY2d, at p 356) and despite the probable desirability for the same reason of a higher standard of proof than in ordinary civil cases,[24] the civil rule as to the trial of an incompetent (CPLR 1201) is here applicable. As to whether respondent is “incapable of * * * defending [her] rights” within the meaning of CPLR 1201, no detailed definition of incapability is set forth in the CPLR; it is appropriate therefore for respondent’s protection to utilize the CPL’s definition of incapacitation (see note 16 above). Utilizing that definition, this court’s chief psychiastrist came to a contrary conclusion from the opinions submitted to the criminal court and reported that respondent understood the. proceedings against her and could assist in her defense despite her mental illness (an impression also obtained by this court on the basis of a courtroom colloquy). However, in order to proceed expeditiously to trial without the delay required for a hearing as to the conflicting views on respondent’s competency and in order to give respondent the protection that arguably could be necessary, a guardian ad litem was appointed for respondent.[25]

. According to the petition, after scalding Vance’s infant-brother with water, respondent mother placed him in the kitchen oven; Vance witnessed these acts and suffered burns on his back (see note 9 below as to relation of respondent’s mental illness to the alleged acts).
The statutory definition of child abuse is, in pertinent part, “a substantial risk of physical injury * * * by other than accidental means which would be likely to cause death or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ.” (Family Ct Act § 1012, subd [e], par [ii].)

. For example, such a motion has also been made in a child abuse case brought for the protection of the younger half-siblings of a three-year-old child who was, according to the petition, “dead on arrival at the hospital.” The allegations — less bizarre and more customary than those in the instant case — were that according to hospital and autopsy reports the cause of death was “battered child syndrome,” in that the child sustained “multiple body bruises brought on by beating,” and laceration of the liver. Both the mother and her *256 paramour, who was living in the home and was the father of the youngest child, have been arrested.
The District Attorney on occasion joins in the motion for indefinite adjournment, urging that the Family Court proceeding would give respondent a preview of the evidence and thus interfere with the prosecutor’s control of the criminal case.

. The guarantee of the privilege has the same meaning in the State and Federal Constitutions (see People v La Bello, 24 NY2d 598 [overruled only in other respects Matter of Gold v Menna, 25 NY2d 475, 481]), and applies in civil as well as criminal proceedings. (Maness v Meyers, 419 US 449, 464; Lefkowitz v Cunningham, 431 US 801.)

. A similar question was argued, but left undecided, in Oleshko v New York State Liq Auth (21 NY2d 778) wherein the plaintiff sought an injunction of a hearing to revoke his liquor license; he argued that if he testified at the revocation hearing “which he would have to do in order to defend himself, he would be deprived of his right to stand mute at his criminal trial [involving the same charge] since the District Attorney would have access to the statements made by him at the hearing” (21 NY2d, at pp 779-780). The court affirmed (p 780) the order below “on the opinion at the Appellate Division;” in that opinion (29 AD2d 84) the court rested on various nonconstitutional grounds, *258 including the fact that plaintiff had not sought a dismissal of the criminal charge against him despite the long delay in bringing it to trial. See, also, Langemyr v Campbell (21 NY2d 796) where the court relied, without opinion, on Oleshko; a stay of arbitration was there sought on constitutional grounds because of a pending criminal prosecution involving the same acts.

. McCracken v Corey (612 P2d 990, 995).

. Objections to concurrent civil and criminal proceedings based on the same underlying acts, have elicited varying views as to the privilege against self incrimination and due process of law in the Federal courts. (Cf., e.g., De Vita v Sills, 422 F2d 1172, 1178-1179; Iannelli v Long, 487 F2d 317, 318; Silver v McCamey, 221 F2d 873, 874-875; Arthurs v Stern, 427 F Supp 425, 433; see, also, People v Coleman, 13 Cal 3d 867.)
While United States v Kordel (397 US 1, 3, 5) involved “simultaneous civil and criminal proceedings” and is cited as authority favorable to their maintenance, in fact any claim as to the privilege against self incrimination was “expressly disavowed”, the civil defendant being a corporation.

. This court will not draw an adverse inference from respondent’s silence if petitioner calls her to testify and she invokes her privilege, or if petitioner establishes a prima facie case and she is silent. Such an inference would be unreasonable (Cf. Slochower v Board of Educ, 350 US 551, 557). For, in view of the gravity of the criminal charge against her she might fear to testify despite her innocence and despite a grant of immunity (as to immunity, see point II below). (Cf. as to ambiguity of silence, United States v Hale, 422 US 171, 176; Doyle v Ohio, 426 US 610, 617.)

. See application of this principle in McCracken v Corey (612 P2d 880; De Vita v Sills (422 F2d 1172, 1178, 1180).

. The evidence may support a child abuse finding though not a criminal verdict, not only because of a difference in the required quantum of proof, but also because an abuse finding is proper under section 1012 of the Family Court Act whether respondent inflicted or permitted or caused infliction of the injury, and it is sometimes unclear which of these facts is true. Further, a child’s out-of-court statements as to child abuse are admissible under section 1046 of the Family Court Act, though they would otherwise be deemed inadmissible hearsay. Thus, while such hearsay must be scrutinized with caution it appears from pretrial proceedings in the instant case that Vance made credible, consistent and reliable statements shortly after the incident, about respondent mother’s deliberate burning of his brother and himself in an incident that an adult would describe as an “exorcism” rite.

. In the case of willing and fit relatives, the court of course has to consider whether they can and will give the children any needed protection from the parent. While the Commissioner of Social Services has independent authority to parole a child in foster care to a relative or even to a respondent parent, he has not been known to exercise this power while a criminal case involving a homocide or serious injury is pending.

. See Murphy v Waterfront Comm. (378 US 52) and Gardner v Broderick (392 US 273, 276). The Family Court Act’s immunity provision was enacted in section 9 of chapter 962 of the Laws of 1970.

. And shortly before enactment of the Family Court Act immunity provision, the Court of Appeals had held that the CPL wording required a grant of immunity broader than that constitutionally required under the later Supreme Court decisions. See Matter of Gold v Menrua (25 NY2d 475, 481) seemingly overruling People v La Bello (24 NY2d 598) in this respect. See Lefkowitz v Cunningham (431 US 801, 809) stating that the CPL immunity is broader than the Federal Constitution requires.
It may be noted that a provision for transactional immunity would have been inapppropriate in the Family Court Act. Though in many child abuse cases criminal processes are undesirable from the standpoint of the goals of the criminal law, there are some in which a longer sentence of incarceration than the six months possible in the Family Court is necessary to protect other children or even adults from uncontrollable violence by the respondent.

. See Piceirillo v New York (400 US 548, 568 [BRENNAN, J. dissenting]); Tierney v United States (409 US 1232, 1233-1234) as to a witness’ fear of self incrimination despite use and derivative-use immunity.

. See Matter of Dorothy D., (49 NY2d 212, 215); Matter of Hynes v Karassik (47 NY2d 659, 664) as to court’s power to seal its records and to keep its proceedings confidential.

. Compare United States v Kordel (397 US 1, 12, n 27): “Federal courts have deferred civil proceedings pending the completion of parallel criminal prosecutions when the interests of justice seemed to require such action”.

. Under GPL 730.10 (subd. 1) a defendant in a criminal case is incapacitated from standing trial if he “lacks capacity to understand the proceedings *265 against Mm or to assist in Ms own defense.” The prohibition on trial of such a person is constitutionally as well as statutorily mandated. (See Pate v Robinson, 383 US 375, 378, 385-386; Massey v Moore, 348 US 105, 108.)

. The cases are collected in Matter of Tony W. (91 Misc 2d 700, 702).

. Matter of Smiley (36 NY2d 433, 439-441); Potashnick v Port City Constr. Co. (609 F2d 1101, 1118).

. See Dale v Hahn (311 F Supp 1293, 1299-1300, mod 440 F2d 633, 639) as to presumption of incompetence from adjudication of mental illness for purpose of an involuntary commitment.

. People v Medina (44 NY2d 199, 207 [“Under our State and Federal Constitutions, an indigent defendant in a criminal case is guaranteed the right to counsel”]); Scott v Illinois (440 US 367, 374 [counsel guaranteed in any case in which any term of imprisonment is imposed]).

. Habeas corpus cases are, however, in general classified and treated as civil cases. (People ex rel. Curtis v Kidney, 225 NY 299, 304; CPLR art 70.)

. See Matter of Buttonow (23 NY2d 385). And see Dooling v Overholster (243 F2d 825, 826-829); Howard v Overholster (130 F2d 429, 434) indicating that counsel or a guardian ad litem is constitutionally required for the protection of the allegedly mentally ill respondent in such a proceeding.

. See O’Connor v Donaldson (422 US 563, 573, 575).

. Although the Family Court Act only requires a “preponderance of the evidence” (§1046, subd [b]), some Judges have adopted the clear and convincing evidence standard.

. See Sengstack v. Sengstack (4 NY2d 502, 509) as to appointment of guardian ad litem for person suspected of incompetence though not “judicially declared such”; see, also, Matter of Manufacturers Hanover Trust Co. (73 AD2d 539).
The court appointed Sister Eileen, a chaplain at Bikers Island where respondent was detained, as respondent’s guardian ad litem, at respondent’s request and after review of Sister Eileen’s understanding and acceptance of the role and her qualifications therefor.