JOE T. TERRELL, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Terrell v. Commissioner
Docket No. 14315-85.
United States Tax Court
T.C. Memo 1987-520; 1987 Tax Ct. Memo LEXIS 560; 54 T.C.M. (CCH) 870; T.C.M. (RIA) 87520; October 5, 1987. Claude R. Wilson, Jr., and William S. Lee, for the petitioner. James B. Ausenbaugh, for the respondent. WILLIAMS
MEMORANDUM FINDINGS OF FACT AND OPINION WILLIAMS, Judge: The Commissioner determined deficiencies and additions to tax for fraud for petitioner's taxable years 1978, 1979, 1980 and 1981 as follows: Section 6653(b) [1]
Year
Deficiency
Addition to Tax
1978
$ 5,958.21
$ 2,979.11
1979
2,133.70
4,646.84
1980
3,680.23
1,840.12
1981
5,646.10
2,823.05
*562 For 1981 respondent determined, in the alternative to the addition to tax for fraud, that petitioner is liable for the addition to tax for negligence pursuant to section 6653(a). Respondent concedes that the statute of limitations bars assessment and collection of the deficiencies for 1978, 1979 and 1980 unless petitioner's returns were false or fraudulent within the meaning of section 6501(c). The issues we must decide are (1) whether petitioner and others were engaged in the sale of credit life insurance as a partnership for Federal income tax purposes; (2) whether petitioner is liable for the additions to tax for fraud pursuant to section 6653(b) for his taxable years 1978, 1979, 1980, 1981; and (3) if petitioner is not liable for the addition to tax for fraud for 1981, whether he is liable for an addition to tax for negligence pursuant to section 6653(a). This case has a lengthy procedural background. Respondent issued his notice for deficiency on May 2, 1985. In determining the deficiencies for 1980 and 1981, respondent failed to take into account amounts assessed on April 1, 1985 in response to petitioner's amended returns filed in 1983. Petitioner timely filed *563 his petition with this Court on May 25, 1985. On May 5, 1986, petitioner filed a motion for partial summary judgment pursuant to Rule 121, [2] requesting us to find that, because of the prior assessments, no deficiency existed for 1980 and that the deficiency for 1981 could not exceed $ 197.66. In our opinion filed October 7, 1986, [3] we denied petitioner's motion because we could not determine whether there were deficiencies in petitioner's Federal income tax for 1980 and 1981 prior to trial. In addition, we concluded that even if there was no deficiency for 1980 and a deficiency of $ 197.66 for 1981 because respondent had previously assessed the remaining amounts listed on the notice of deficiency, there could nevertheless be an underpayment of tax for 1980 and 1981 within the meaning of section 6653(c) measured by the difference between petitioner's corrected tax liability and the tax liability shown on his timely filed original return. Moreover, even if there was no deficiency for 1980 and the addition to tax for fraud was not determined, we concluded that we nonetheless had jurisdiction over that year because the issuance of a valid notice of deficiency and the filing of a timely *564 petition vests jurisdiction in this Court, regardless of whether a deficiency actually exists. Stevens v. Commisioner,709 F.2d 12, 13 (5th Cir. 1983), affg. a Memorandum Opinion of this Court; Naftel v. Commissioner,85 T.C. 527, 530 (1985). The trial was held on October 30, 1986 and March 9, 1987 at Dallas, Texas. At the trial session on October 30, 1986, petitioner asserted his 5th Amendment privilege against self-incrimination. We continued the trial to permit respondent to request limited immunity for petitioner. On January 5, 1987, respondent informed the Court that he would not seek a grant of immunity for petitioner. We ordered a deposition of petitioner so that additional specific questions to which petitioner objected would be in the record. In a memorandum sur order dated February 19, 1987, we concluded that petitioner had established a proper basis on which to assert his 5th Amendment privilege with respect to all questions put forward by respondent at trial and at the subsequent *565 deposition except for those relating to petitioner's occupational background and education, as to which we concluded he had waived his privilege. To avoid prejudice, however, we also barred petitioner from offering into evidence "any matter relating to the factual bases for his denials and defense as to which he has asserted his Fifth Amendment rights." Traficant v. Commissioner, 89 T.C.     (filed September 10, 1987); S.E.C. v. Cymaticolor Corp.,106 F.R.D. 545, 549 (S.D. N.Y. 1985); see also In re Anthracite Coal Antitrust Litigation,82 F.R.D. 364 (M.D. Pa. 1979). At the conclusion of the trial on March 9, 1987, petitioner testified concerning the limited matters as to which the Court concluded he had waived his 5th Amendment privilege. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioner, Joe T. Terrall, resided at Jacksonville, Texas at the time he filed his petition in this case. Petitioner is a banker and has been the president of the First State Bank of Rusk, Texas ("the Bank") since 1970. As such, he is responsible for the day-to-day management of the bank. Petitioner also served as *566 a loan officer during the years in issue and made loans to customers on a regular basis. Petitioner has a college education but did not take any tax or accounting classes in college. He has since attended several graduate banking schools. Lewie Byers has been employed by the Bank for 19 years and has been its executive vice president for 10 years. He was also a loan officer during the years in issue. Clyde Weaver was a vice president of the Bank and a loan officer during the years in issue. Jeff Austin, Sr. was Chairman of the Board and majority stockholder of the Bank. During the years in issue it was illegal for a bank to have an agency agreement with an insurance company. It was, therefore, common practice in Texas for individual officers to enter into agency agreements. Petitioner, Byers and Weaver individually entered into agency agreements with a number of insurance companies and were authorized to sell credit life insurance from 1978 through 1982. The officers had an informal arrangement for sharing income and expenses from the sale of credit life insurance. They opened an account at the Bank (the "credit life account"), to which all three officers had access *567 and which Byers managed. Gross premiums from all sales were deposited in the credit life account regardless of who wrote the policy. Premiums owed to the insurance companies and all other expenses were paid out of the account. Any amount remaining at the end of each month, after set payments were made to members of Austin's family who were employed at the Bank, was divided among petitioner, Byers, Weaver, and Jeff Austin, Sr. The division of funds was roughly equal; it was not determined by reference to the amount of insurance written by any officer. Jeff Austin, Sr., as Chairman of the Board and majority stockholder of the Bank, decided how the money from the credit life account would be distributed. Although Austin conceivably could have kept all the money, Byers testified that in the 19 years he had worked at the Bank, the funds had always been distributed. Moreover, petitioner, Byers and Weaver all had signatory authority on the account and could withdraw money at any time. At various times during the years in issue, seven people shared in the credit life commissions: petitioner, Byers, Weaver, Jeff Austin, Sr., Jane Chapman (Jeff Austin, Sr.'s daughter), Jeff Austin, Jr. *568 and Pat Neill (Jeff Austin, Sr.'s son-in-law). Austin, Jr., who wrote no insurance, received a fixed monthly payment of $ 200.00 and later $ 400.00. Pat Neill, who wrote no insurance, also received at least one payment of $ 400. Petitioner, Byers, Weaver and Chapman (to whom Jeff Austin, Sr. gave his share) divided the remainder equally. Byers generally prepared the monthly checks for distribution. With his check, each officer received a production sheet showing the amount of credit life insurance written that month and the cash being distributed. The funds distributed from the credit life account consisted of commissions net of expenses, including the payment of premiums to the insurance companies and $ 100.00 per month in rent to the Bank. Certain expenses from the credit life activity, however, often arose after distributions were made. The officers sometimes wrote insurance in an amount larger than a customer needed and had to repay unearned commissions. In addition, when a customer prepaid a loan, the officers had to pay off a percentage of the unused premium. During the years in issue, approximately 100 policies were written each month and 20 to 30 refunds were made. *569 When there were not enough funds in the credit life account to cover these payments, petitioner, Byers and Weaver made the payments out of their own funds. [4] The officers were not reimbursed for their payments on behalf of the credit life account. The officers were also exposed to large potential liabilities in connection with the credit life policies if the Bank collapsed. [5]
There were no books maintained in connection with the credit life activity other than a record of checks written on *570 and deposits to the credit life account. [6] In addition, although Byers testified that he did not know what the credit life activity could be but a partnership, no partnership returns were filed during the years in issue and no determination of partnership income was made. The officers began filing partnership returns for the credit life activity after 1981. From 1978 through 1981, petitioner received checks nearly every month from the credit life account. The total payments petitioner received each year were as follows: Year
Amount
1978
$ 11,398.25
1979
8,780.05
1980
[7] 9,591.95
1981
9,023.12
Petitioner deposited checks from the credit life account totaling $ 2,300.00 in his account at the Bank in 1978. He cashed the rest of the checks received from the *571 credit life account in 1978 and all of the checks he received from the credit life account in 1979, 1980 and 1981. During the years in issue, petitioner received Forms W-2, 1099-NEC, 1099-MISC and 1099-DIV and other income statements from the Bank and from the First National Bank of Jacksonville, where he was also employed. Petitioner also received a Form 1099-NEC for the taxable year 1979 from the First Continental Life and Accident Insurance Company, with whom he had an agency agreement, for commissions totaling $ 19,728.46. For the taxable year 1980, petitioner received a Form 1099-NEC from the Transport Life Insurance Company for commissions totaling $ 5,951.92. The amounts shown on the insurance company Forms 1099-NEC reflected policies sold by petitioner, Byers and Weaver. The officers sold policies regardless of the specific company that each had an agency agreement with, and the net proceeds were divided equally among the beneficiaries of the credit life account without regard to how much insurance each had written. Timothy Smith, C.P.A., was petitioner's accountant for approximately eight years. Smith prepared petitioner's 1978, 1980 and 1981 income tax returns. *572 Another partner in his firm prepared petitioner's 1979 return. Petitioner provided Smith with Forms W-2 and 1099 from the First State Bank of Rusk and the First National Bank of Jacksonville and with bank statements from which Smith determined deductions and looked for any unexplained income. Smith relied on petitioner to provide him with all of the information necessary to prepare his returns and did not ask petitioner whether he had disclosed all of his income. Petitioner did not disclose his income from credit life insurance activity to Smith and did not provide him with the Forms 1099 received from the insurance companies. Petitioner's share of the net proceeds from sales of insurance was, therefore, not reported on his 1978, 1979, 1980, and 1981 income tax returns. On March 26, 1982, petitioner received a letter from respondent concerning a Form 1099-NEC received from First Continental Life and Accident Insurance Company showing $ 19,728.00 in income for 1979 which was not reported on petitioner's return. Smith filed an amended return on petitioner's behalf on April 26, 1982, with a note attached conceding that petitioner had failed to claim commission income on his *573 original return and explaining that petitioner shared the commissions with others and only received one-fourth of the amount shown on the Form 1099. Petitioner reported an additional $ 4,932.00 in income, representing his share of the insurance commissions received from First Continental in 1979. Respondent accepted petitioner's explanation of the amount of unreported income and assessed the additional tax due. On October 12, 1982, petitioner received another letter from respondent proposing adjustments to his 1980 income tax return because petitioner had not reported commission income of $ 5,951.92 as shown on the Form 1099-NEC from Transport Life Insurance Company. Petitioner replied by letter that he had received commissions in that amount but had paid $ 4,463.25 as commissions to others. Respondent accepted this explanation and petitioner agreed to an additional income tax assessment of $ 728.00, which amount was assessed on February 14, 1983. On or abut May 6, 1983, Smith filed an amended return for petitioner's 1980 taxable year reporting an addition $ 9,023.00 in insurance commissions which petitioner stated he had forgotten to include. [8]
*574 Smith filed an amended return on petitioner's behalf for 1981 on May 9, 1983, again in response to a letter from respondent. On it petitioner reported $ 10,449.23 in commission income which he had failed to claim on his original return. Petitioner paid the additional taxes due for 1979, 1980 and 1981 before respondent issued his notice of deficiency on May 2, 1985. In filing the amended returns, Smith relied on the dollar figures petitioner provided to him over the telephone. By the time Smith filed the amended return for 1979 on April 22, 1982, petitioner had already filed his return for 1980 but had not yet filed his 1981 return. Petitioner did not tell Smith that he had also failed to report commission income on those returns. In addition, Smith did not ask petitioner about any cash expenditures during the years in issue and petitioner did not volunteer any information. After he filed the first amended return, Smith did not make a note in petitioner's file to check for commission income before filing returns for subsequent years. Smith reported the commission income on Schedules C and SE of the amended returns because he believed that it was self-employment income *575 from the sale of life insurance. Although Smith knew that petitioner shared the income from insurance commissions with others, it did not occur to him that petitioner's share of the commissions might be partnership income reportable on Schedule E. Petitioner never indicated to Smith that his arrangement to pool insurance commissions was a partnership. Petitioner signed reports prepared for the Bank's stockholders and directors for each of the years in issue. The reports listed the individuals who shared in the credit life commissions in each year and estimates of how much each received. Byers prepared the reports for petitioner's signature and petitioner had no independent knowledge of the dollar amounts reported. The reports did not refer to the credit life arrangement as a partnership. Petitioner was indicted for willfully attempting to evade or defeat income tax in violation of section 7201 for his taxable years 1978, 1979, 1980 and 1981. At the criminal trial, a government witness testified that the allegedly unreported income was derived from a partnership. On June 12, 1984, a jury found petitioner not guilty. [9]
*576 OPINION The primary issue we must decide is whether petitioner is liable for the addition to tax for fraud for the taxable years 1978, 1979, 1980 and 1981. Respondent bears the burden of proving fraud. Rule 142(b). To meet his burden, respondent must show for each year, by clear and convincing evidence, that there was an underpayment of tax and that some part of the underpayment was due to fraud with intent to evade tax. Section 6653(b). Petitioner contends that he was a member of a partnership engaged in selling credit life insurance and that because respondent did not determine the partnership's taxable income, he did not meet his burden of proving an underpayment of tax for any of the years in issue. Respondent argues that the arrangement for pooling and dividing insurance commissions was an employer-employee relationship and not a partnership. Moreover, even if we find that a partnership existed, respondent contends that he has met his burden of proof. We consider first whether the credit life insurance arrangement was a partnership. A partnership, for Federal tax purposes, *577 "includes a syndicate, group, pool, joint venture or other unincorporated organization through or by means of which any business, financial operations or venture is carried on, and which is not, within the meaning of this title [subtitle], a corporation or a trust or estate." Section 761(a). A partnership is formed when the parties to a venture join together capital or services with the intent of carrying on a business enterprise and sharing in profits or losses or both. Commissioner v. Culbertson,337 U.S. 733, 742 (1949); Commissioner v. Tower,327 U.S. 280, 287-288 (1946); see also Luna v. Commissioner,42 T.C. 1067, 1077-1078 (1964). Although we find it to be a close question, we conclude that petitioner, Byers and Weaver were partners during the years in issue. Petitioner, Byers and Weaver did not enter into a written partnership agreement, did not file partnership returns and did not maintain separate books and records for the credit life activity. They nonetheless had an implied agreement in fact to share profits and losses from the credit life insurance activities which they adhered to during each of the years in *578 issue. See section 1.761-1(c), Income Tax Regs. The officers pooled all of their insurance commissions in the credit life account and shared the net proceeds in the account equally regardless of how many policies each had written. In addition, the officers paid all expenses out of the credit life account and made capital contributions when there was not enough money in the account to cover expenses. Each officer had signatory authority over the account and could withdraw money at any time. The officers thus exercised mutual control over and assumed mutual responsibility for the credit life activity. Respondent argues that no partnership existed because Jeff Austin, Sr. was the only individual with a proprietary interest in the credit life account. Respondent asserts that Austin exercised complete control over the income from the credit life activity and that petitioner, Byers and Weaver were merely employees who received contingent compensation in the form of a share in the business' profits. Respondent notes that Austin decided how the money earned from the credit life activity would be distributed and Byers testified that although he had never *579 done so, Austin could conceivably have kept all of the commissions himself. In addition, even though the officers sold all of the credit life insurance, Austin provided shares in the insurance commissions for several members of his family. [10]
*580 Although Austin did exercise control over the distribution of net income from the credit life activity, we do not find his level of control inconsistent with the existence of a partnership among Austin, petitioner, Byers and Weaver. Austin's control over the distribution of funds appears to be the equivalent of the participation by any dominant, senior partner in deciding allocable shares of partnership income and not the equivalent of the control exercised by a sole proprietor. The officers had authority to withdraw money from the credit life account at any time without Austin's permission, and they paid expenses out of the account before Austin determined how the remainder should be distributed. If there were insufficient funds in the account to cover expenses, the officers contributed their own money. Austin provided shares in the credit life commissions to members of his family who played no part in earning the income, but we again do not find this inconsistent with the existence of a partnership. The payments to Austin's family were either a funneling of Austin's own distributive share or additional costs incurred by the partnership before net profits (or losses) were distributed *581 equally among the partners. The credit life insurance business of the Bank officers was a continuing, substantial business the profits and losses of which were to be shared by Austin, petitioner, Byers and Weaver as a partnership. We must next determine whether respondent has met his burden of proving an underpayment of tax for each of the years in issue. A partner is taxable on his distributive share of the partnership's taxable income as determined at the close of the partnership's taxable year. Section 706. To prove that the distributions from the credit life account constituted taxable income to petitioner, respondent must, therefore, first establish what the partnership's taxable income was at the close of each of the years in issue. Section 1.706-1, Income Tax Regs. He has failed to do so.
A partnership computes its taxable income in the same manner as an individual except that it must separately state certain items that may affect individual partners differently, *582 and it may not take certain deductions because the partners take them individually. See section 703. Respondent argues that because the partnership's sole source of income was commissions from the sale of credit life insurance and all expenses were paid before amounts were distributed to the partners, the total amount distributed to the partners each year is a reasonable approximation of the partnership's taxable income. We disagree. Cash distributed is, for Federal income tax purposes, not a valid measure of any partner's distributive share of partnership income. See section 1.702-1, Income Tax Regs. We could speculate that taxable income exists, but there is no clear and convincing evidence of it in the record. Respondent could have requested records of the credit life checking account from petitioner in the course of preparing for trial. From the records of deposits to and checks written on the account he would have been able to approximate the partnership's taxable income. Respondent failed to do so and we, therefore, find that respondent has not met his burden of proving an underpayment of tax for any of the years in issue. [11] Consequently, *583 we need not comment on petitioner's intent to evade tax within the meaning of section 6653(b). Because we found that petitioner is not liable for the addition to tax for fraud for 1978, 1979 and 1980, the statute of limitations bars respondent from assessing and collecting the deficiencies for those years. Section 6501(a). For 1981, *584 however, the parties agree that the statute of limitations has not run. We must, therefore, determine whether a deficiency exists for that year. Petitioner bears the burden of proving that respondent's determination is incorrect. Rule 142(a). We find that there is a deficiency in income tax due for petitioner's 1981 taxable year of $ 1997.66, representing the difference between the amount shown on the notice of deficiency and the amount assessed prior to the issuance of the notice. Petitioner has not proven otherwise. Respondent argues that if petitioner is not liable for the addition to tax for fraud for 1981, he is liable for the addition to tax for negligence pursuant to section 6653(a). Section 6653(a) provides for an addition to tax if there is an underpayment of tax and any part of the underpayment is due to negligence or intentional disregard of rules and regulations. Petitioner bears the burden of proof on this issue. Rule 142(a). Our conclusion that respondent did not carry his burden for purposes of the addition to tax for fraud does not bear upon whether petition has met his burden, for purposes of the addition to tax for negligence, of proving that there is *585 no underpayment of tax for 1981. The issues of fraud and negligence are independent, and respondent's failure to prove an element of fraud does not imply petitioner's success in disproving negligence.
An underpayment is measured by the difference between petitioner's correct tax liability and the tax liability as shown on his timely filed original return. Section 6653(c)(1). We have found a deficiency of only $ 197.66 for 1981 because the remaining amount of the deficiency determined by respondent has already been assessed. Amounts previously assessed, however, are not taken into account in calculating an underpayment for purposes of section 6653(a). See section 301.6653-1(c)(1), Proced. and Admin. Regs. Petitioner has not presented any evidence relating to the partnership's taxable income for 1981, and we, therefore, accept respondent's determination. We find that petitioner had an underpayment of tax for 1981 in the amount of $ 5,646.10. We must next determine whether any part of the underpayment is due to negligence. Petitioner contends that he did not report his share of the *586 commission income on his income tax returns because he believed it was included in the Forms W-2 and 1099 he received from the Bank. Even if petitioner truly believed that his commission income was included in his income statements from the Bank, which we doubt, he was negligent in continuing to hold that belief after he received the first letter from respondent dated March 26, 1982. In that letter, respondent informed petitioner that he had failed to report insurance commission income on his 1979 return. In response, petitioner filed an amended return on or about April 22, 1982. The letter put petitioner on notice that his share of the credit life insurance was not included on his Forms W-2 and 1099 from the Bank and should be included as income on the 1981 return, which he signed on June 11, 1982. We find that petitioner was negligent in not including his distributive share of income on his 1981 return and sustain respondent's determination. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
2. All Rule references are to the Tax Court Rules of Practice and Procedure. ↩
3. Terrell v. Commissioner,T.C. Memo. 1986-507↩. 4. Byers, who managed the credit life account, testified that he, petitioner and Weaver, on occasion, had to contribute their own money to pay off debts. Weaver testified that he could not remember any of the participants ever contributing money. Weaver also testified, however, that he did not handle payments from the credit life account and that Byers had more knowledge of the activities than he did. We thus accept Byers' testimony. We also note that Weaver pled guilty to tax evasion in connection with his insurance activities in the Bank. ↩
5. If the Bank failed, petitioner, Byers and Weaver would have to refund the amounts customers had paid on credit life insurance policies. ↩
6. These records are retained at the Bank on microfilm and were available had respondent requested them in preparing this case for trial. ↩
7. This total includes a check for $ 401.23 drawn on Byer's checking account on April 22, 1980 and made payable to petitioner. The parties have treated this check as if it were a distribution from the credit life account, and we shall do the same.↩
8. Shortly before petitioner filed his amended return for 1980, the Criminal Investigation Division of the Internal Revenue Service began an investigation of Clyde Weaver's tax affairs. Petitioner's decision to report additional commission income appears to be a response to that investigation. ↩
9. Weaver was indicted for income tax evasion and pleaded guilty. ↩
10. Respondent also asks us to draw an adverse inference as to the existence of a partnership from petitioner's refusal to answer questions concerning the alleged partnership on 5th Amendment grounds. In a civil proceeding we may draw a negative inference from party's invocation of his 5th Amendment right against self-incrimination provided that there is some independent evidence in addition to the mere invocation of the privilege upon which to base the negative inference. Baxter v. Palmigiano,425 U.S. 308 (1976); United States v. Local 560 of the International Brotherhood of Teamsters,780 F.2d 267, 292-293 n.32 (3d Cir. 1985), cert. denied 106 S. Ct. 2247 (196). In the instant case respondent has not presented sufficient probative evidence against petitioner to create a prima facie case against the existence of a partnership. The rule set forth in Baxter,↩ therefore, does not apply. 11. Although respondent did not raise the issue, we note that petitioner filed amended returns for 1979, 1980, and 1981 in which he reported that he had underpaid his taxes for each year by failing to include commission income on his original return. Petitioner's filing amended returns, however, does not establish that there was, in fact, an underpayment of tax for any of the years in issue. When he filed his amended returns, petitioner was proceeding under the incorrect assumption that the credit life activity was not conducted as a partnership. He has since changed his legal theory, and we have found that a partnership existed. We do not treat petitioner's admission as establishing an underpayment of tax because the existence of a partnership is a legal conclusion that ultimately determines whether there is an underpayment in this case. ↩