J-S45042-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| H.S. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| T.S. | : | |
| | : | |
| Appellant | : | No. 561 MDA 2018 |

Appeal from the Order Entered March 1, 2018
in the Court of Common Pleas of Lancaster County
Civil Division at No.: CI-17-01178

BEFORE: PANELLA, J., OTT, J., and PLATT*, J.

MEMORANDUM BY PLATT, J.: **FILED AUGUST 28, 2018**

T.S. (Father) appeals from the March 1, 2018 child custody order, granting the petition of H.S. (Mother) to modify the existing custody arrangement wherein both parents shared legal and primary physical custody of their son, C.S., born September 2015. After careful review, we affirm.

We derive the following statement of facts and procedural history from the trial court opinion, and our independent review of the record. (**See** Trial Court Opinion, 4/18/18, at 1-5). C.S. was born in September 2015 to Father and Mother, who were in a relationship at the time of the birth. Mother has a daughter, C.Z., from a previous relationship, approximately six years of age. The family resided in Lancaster County. Mother and Father separated in July 2016, and, at first, C.S. spent equal time living with each parent.

_____
* Retired Senior Judge assigned to the Superior Court.

Father has moved several times since separating from Mother. Previously, he lived in East Petersburg, Pennsylvania. Shortly before the custody hearing he informed Mother he had moved to Harrisburg. Father is employed as a manager at a truck sales office, where he has worked for fifteen years. Father has extended family in Lancaster County, who also have relationships with C.S.

Mother is married to T.E. ("Husband"), and lives in Lancaster County with Husband, Husband's sister, and other in-laws. Mother has a nursing license and was previously employed as a nurse, but left the job to care for C.Z. and C.S., and is now home full time with the children. Mother also has extended family in Lancaster County who have relationships with C.S.

In August 2016, Father noticed that C.S. was having difficulty crawling. The child's primary care physician saw nothing wrong on the initial x-ray, but an orthopedist diagnosed a broken arm. The Lancaster County Children and Youth Agency opened an investigation, meeting with both parents, but eventually closed the investigation as unfounded. Mother did not participate in C.S.'s care for this injury.

In February 2017, Father picked up the child from his babysitter to begin his week of physical custody. When Father arrived home, he noticed what he at first assumed was a rash on C.S.'s foot and leg. The next day, a doctor diagnosed the rash as first and second degree burns. Father contacted Mother on Saturday; Mother stated she was unaware of how C.S. had been injured. She had given C.S. a bath Thursday night and had not noticed any burns, and

did not know how he could have been burned. Mother stated that when she took C.S. to the babysitter's home, he was in good health.

Nevertheless, that Monday, Father contacted the Lancaster County Children and Youth Agency, which opened a child abuse investigation that was eventually referred to the local police department. Mother, on the advice of her attorney, refused to speak to the police. Ultimately, there was insufficient evidence to bring charges against her and the case was closed.

At the same time, Father filed a petition for and obtained a temporary protection from abuse ("PFA") order pursuant to 23 Pa.C.S.A. § 6101 *et seq.* As a result of the PFA, Mother was not allowed to see C.S. for approximately one month. The parties then agreed to allow Mother one supervised visit per week. Father eventually withdrew the PFA prior to the entry of a final order. Father stated he did this on the advice of his attorney, who told him he had insufficient evidence to obtain a final order; Father also testified he regretted filing the PFA but knew of no other way to protect C.S.

In February 2017, Mother filed a complaint seeking primary custody of C.S. A temporary custody order was entered; however, due to the PFA proceedings that had been pending at that time, the initial conference was postponed until November 2017. A temporary order was entered at that time. The court convened a custody hearing on February 14, 2018.

At the hearing, Father and Mother, both represented by counsel, testified on their own behalves. Also testifying were Mother's father

("Maternal Grandfather"), G.E.; Husband's mother, K.E.; Police Officer Courtenay Delaney; and M.W., C.S.'s babysitter.

In addition to the facts outlined above, Father testified that Mother was an inattentive parent who delivered C.S. to the babysitter in soiled diapers and without the necessary supplies; that she kept soiled diapers and rotten food in C.S.' diaper bag; and that on at least one occasion she had failed to dispose of dirty diapers in their home. Father admitted that he also sometimes forgot necessary items when dropping C.S. off with the babysitter, and that he had left C.S. overnight with M.W. on several occasions. Father claimed that Mother was not involved in C.S.' daycare, but also admitted he did not consult Mother on the choice of daycare. Finally, Father admitted that he had moved again two weeks before the custody hearing, and that he was not on the lease at his new residence. He intended to move back to Lancaster once he had saved enough money to do so.

Mother denied Father's testimony and noted that C.S. had sustained other injuries, including two separate head wounds, while in Father's care, as well as other injuries while in the care of M.W. Mother testified that she believed Father has used the PFA process to limit her custodial time, and that Father resents Husband spending time with C.S.

On March 1, 2018, the court entered a custody order and opinion detailing its analysis of the sixteen custody factors. (**See** Opinion and Order, 3/01/18, at 1-16); **see also** 23 Pa.C.S.A. § 5328(a). The order granted shared legal custody to both parents and primary physical custody to Mother.

In addition, the order granted partial physical custody to Father every other weekend from 12:00 p.m. on Friday to 9:00 a.m. Monday, and on weeks Father did not have weekend custody, two weeknights, from 3:00 p.m. to 8:00 p.m., the Thursday evening before and the Tuesday evening after the weekend. Additionally, the order set out a shared holiday custody schedule and miscellaneous provisions.

Father timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Father presents eight questions for our review:

1. Whether the trial court's award of primary physical custody to Mother is unreasonable, an abuse of discretion, and not supported by credible evidence of record[?]

2. Whether the trial court failed to give proper weight to Father's role in the child's life as well as the bond with Father and extended paternal relatives with whom the child has frequent regular contact[?]

3. Whether the trial court's decision to award Father partial physical custody on alternate weekends is sufficient to maintain the need for stability and continuity of care for the minor child when the parties have historically equally shared physical custody of the child[?]

4. Whether the trial court's finding that Mother is better able to provide stability and continuity in family life is an abuse of discretion and not supported by the credible evidence of record[?]

5. Whether the trial court's failure to find evidence compelling as related to Mother's inability and unlikelihood to attend to the child's needs, was an abuse of discretion[?]

6. Whether it was an abuse of discretion for the trial court to penalize Father for trying to protect the minor child from physical abuse when there was medical evidence of a broken arm, first and

second degree burns on the child's foot and lower leg, and no credible explanation was provided as to the cause of the child's injuries[?]

7. Whether the trial court's finding that "Father used the Protection from Abuse statute in bad faith to manipulate the custody arrangements...", and "Father was quick to use the Protection from Abuse statute as well as reports to the Children and Youth Agency, to gain advantage relative to custody", was an abuse of discretion and not supported by credible evidence of record[?]

8. Whether the trial court erred by failing to draw a negative inference from Mother's refusal to cooperate in the investigations to ascertain how the minor child sustained first and second degree burns on his foot and lower legs[?]

(Father's Brief, at 17-18) (unnecessary capitalization omitted).

Our standard of review in custody appeals is well-settled.

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*E.R. v. J.N.B.*, 129 A.3d 521, 527 (Pa. Super. 2015), *appeal denied*, 135 A.3d 586 (Pa. 2016) (citation omitted).

"The primary concern in any custody case is the best interests of the child." *J.M.R. v. J.M.*, 1 A.3d 902, 911 (Pa. Super. 2010). "The best-interests standard, decided on a case-by-case basis, considers all factors that

legitimately have an effect upon the child's physical, intellectual, moral and spiritual well being." *Id.* (citation omitted). With regard to the abuse of discretion standard,

> [a]lthough we are given a broad power of review, we are constrained by an abuse of discretion standard when evaluating the court's order. An abuse of discretion is not merely an error of judgment, but if the court's judgment is manifestly unreasonable as shown by the evidence of record, discretion is abused. An abuse of discretion is also made out where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence.

*M.A.T. v. G.S.T.*, 989 A.2d 11, 18-19 (Pa. Super. 2010) (*en banc*) (citations omitted).

By statute, the court must consider the following custody factors:

> **(a) Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:
>
> > (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.
> >
> > (2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.
> >
> > (2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).
> >
> > (3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another.  A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a); *see also J.R.M. v. J.E.A.*, 33 A.3d 647, 652 (Pa. Super. 2011) (trial court errs if it fails to consider required factors in rendering custody decision).

Here, the trial court made a thorough analysis of the custody factors listed above and found factors 1, 2, 4, 6, 8, 11, and 16 in favor of Mother:

> 1. Which party is more likely to encourage and permit frequent and continuing contact between the child and another party. Father filed a protection from abuse action on behalf of the Child and against Mother; this kept the Child from Mother for approximately one month and has significantly limited her custody time. Father testified that he filed the PFA action because of the Child's injuries and because he knew of no other way to protect the Child. Father expressed regret in his testimony that the PFA kept the Child away from Mother for so long. The court does not find Father's testimony credible in this regard. It appears to the court that Father used the protection from abuse statute in bad faith to manipulate the Child's custody arrangements. Mother also testified that Father withheld the Child from her shortly after their separation, and Father did not deny this testimony. Father offered no testimony that Mother ever withheld the Child from him.
>
> 2. The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child. Father requested and received a temporary protection from abuse order against Mother on behalf of the Child following his discovery of burns on the Child's foot and leg. Father eventually withdrew this order upon the advice of his attorney that he did not have evidence to be granted a final order. The court entered no final order against Mother and made no finding of abuse.
>
> 2.1 The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services). The Children and Youth Agency investigated Mother on two separate occasions. First because of the Child's broken arm. The Agency marked this investigation as unfounded for abuse on Mother's part. The second Agency investigation began following Father's discovery of what proved to be first and second degree

burns on the Child's foot and leg. The Agency listed Mother as the perpetrator of the injury and referred the investigation to law enforcement. The local police department investigated but did not have evidence to bring any charges against Mother. The case has been closed by both the Agency and law enforcement.

3. <u>The parental duties performed by each party on behalf of the child.</u> Both parties perform parental duties when the Child is in their care. Mother is not currently employed and is available to care for the Child fulltime. Father works fulltime, and the Child is enrolled in daycare during these hours. Prior to their separation, both parties worked and the Child was left with a babysitter. Mother testified that she provided more childcare while the parties were together, as Father worked some evenings and weekends at a second job. Father testified that [he] shared equally in parental duties but allowed that he did work a number of extra hours.

4. <u>The need for stability and continuity in the child's education, family life and community life.</u> The Child is two years old, and does not have significant educational or community involvement. However, he does have significant family involvement with both his parents['] extended families. At the moment, Mother appears better able to provide stability and continuity in family life. While she and her husband do not have an ownership interest or lease on their current residence, they are surrounded by family who can help provide stability for the Child. For his part, Father has stable employment. He works as a manager at [a truck auto sales company], and has been there for fifteen years. Father's residence, however, is unstable. He recently moved from East Petersburg, Pennsylvania to Harrisburg, Pennsylvania. This is his fourth residence in under two years. He is living with friends and does not have an ownership interest or lease on the residence. This relocation has also moved Father away from his extended family. At the moment, Father is less able than Mother to provide stability and continuity in the Child's life.

5. <u>The availability of extended family.</u> Both parties have extended family who are available to care for the Child. Mother lives with her in-laws. The maternal grandfather lives only fifteen minutes away, served as her custodial supervisor, and has a well-developed relationship with the Child. The maternal grandmother lives forty minutes away and also has a well-developed relationship with the child. Although Father's family does not live near his current residence, they do live in Lancaster County. Both

Father's parents and his two sisters have well-developed relationships with the Child.

6. The child's sibling relationships. The Child has one half-sibling, Sister, who is Mother's other child. Mother testified that these two children share a close bond, and that Sister is always anxious to have her little brother nearby.

7. The well-reasoned preference of the child, based on the child's maturity and judgment. The Child is only two years old, not yet old enough to express[] a well-reasoned preference.

8. The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm. Neither party offered any testimony that the other attempts to turn the Child against them. Mother did testify that Father made comments to Sister that might be construed as driving a wedge between her and/or the Child and Mother. Father did not rebut this testimony. The [c]ourt finds that Father was quick to attempt to use the [PFA] statute, as well as reports to the Children and Youth Agency, to gain advantages relative to custody.

9. Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs. Both parents are equally likely to maintain a loving, stable, consistent, and nurturing relationship with the Child adequate for the Child's emotional needs. While Father expressed concern regarding the quality of care the Child received when in Mother's custody . . . Father did not suggest that Mother had deliberately injured the Child or that she was unable or unwilling to love and nurture the Child.

10. Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the Children. The Child has no special needs. Father presented a significant amount of testimony regarding his belief that Mother was unlikely to attend adequately to the Child's other needs. Father presented evidence and testimony that Mother delivered the Child to the babysitter with soiled diapers; that she left soiled diapers, rotten food, and spoiled bottles in the Child's diaper bag; and that she failed to properly dispose of diapers in the home on one occasion. Some of this testimony was corroborated by the parties' babysitter. While the court does not question Father's

credibility in this regard, it also does not find this evidence compelling regarding Mother's ability and likelihood to attend to the Child's needs. Father also testified that Mother has never contacted the Child's daycare provider, except shortly before the hearing to obtain incident reports. The [c]ourt finds that Mother's ability to gain information relative to the Child has been hampered because of the ongoing investigations and Father's intentional notification of those investigations to the U-GRO Learning Center personnel. Father also chose the daycare unilaterally, without seeking Mother's input. Father further testified that, while Mother attended the initial visit to the child's orthopedic physician, she declined to attend or assist with any of the follow-up visits. Mother did not rebut this testimony, but the court notes that it occurred only weeks after the parties' acrimonious separation. Finally, and of greatest concern to the court, are the numerous injuries sustained by the Child. Some of these were indisputably sustained while in Father's custody, including two serious head wounds. However, Mother did not fault Father for these injuries. More serious, and of more concern to the court, are the broken arm, which occurred in August 2016, and the burns, which occurred in February 2017. Father noticed both these injuries and took appropriate steps to provide medical treatment. Father argues that both injuries occurred during Mother's custodial time. While he did not testify that Mother had herself caused the injuries, he suggested that they demonstrate that she is insufficiently attentive to the Child's physical needs. The court does not agree. Father provided no evidence that the arm break occurred in Mother's custody. Father took the child to hospital for examination but none of the initial treating personnel saw evidence of an arm injury. It was only after Father took the child for a second opinion that evidence of a break was discovered. Likewise, Father offered no evidence that the burns occurred in Mother's custody, and Mother credibly rebutted his testimony. While the investigating officer expressed the opinion that Mother caused or knew of the source of the burns, this officer never interviewed Mother and did not bring charges due to lack of evidence. The officer's opinion fails to take into account constitutional safeguards that prevent such conclusory leaps but her ultimate decision not to charge Mother evidences the officer's proper understanding of the law as applied to the facts in this case. Based on the evidence presented, the court cannot conclude in whose custody the injuries occurred—Mother's, Father's, or the babysitter's—and it cannot conclude that these injuries

demonstrate that Mother is less likely than Father to attend to the Child's physical needs.

11. <u>The proximity of the residences of the parties.</u>  Mother lives in New Holland, Pennsylvania.  Father previously lived in East Petersburg, Pennsylvania.  This placed the parties approximately seventeen miles and thirty minutes apart.  However, Father recently relocated to Harrisburg, Pennsylvania . . . This places the parties approximately sixty miles and one hour apart.

12. <u>Each party's availability to care for the child or ability to make appropriate child-care arrangements.</u>  Mother is available to care for the Child fulltime, as she is currently not working.  Father works fulltime and uses a day care during his work hours.  Both parties are able to make appropriate childcare arrangements.

13. <u>The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another.</u>  Right now the level of conflict between the parties is high.  Both the nature of their separation and, especially, the PFA, have not created a cooperative environment between them.  However, the court both believes and expects that, with the PFA withdrawn and a custody routine in place, the parties' ability to cooperate will increase.

14. <u>The history of drug or alcohol abuse of a party or member of a party's household.</u>  Not an issue based on the evidence or testimony presented.  In his letter brief filed after the hearing, Father's counsel mentioned an incident where Father found Mother asleep next to a glass of wine and a bottle of pills.  However, neither Father nor Mother offered any testimony regarding a bottle of pills.  Mother did not deny Father's testimony that he once found her asleep next to a glass of wine, but such a fact does not establish that Mother has a history of alcohol abuse.

15. <u>The mental and physical condition of a party or member of a party's household.</u>  Not an issue based on the testimony and evidence presented.

16. <u>Any other relevant factor.</u>  Father recently relocated from East Petersburg to Harrisburg.  He did this without following the notice requirements outlined in 23 Pa.C.S.A. [§] 5337.  In fact, Mother found out about Father's move only shortly prior to the hearing.  Father argued that his move was not a relocation under the

statute. Mother had only partial custody and Father was providing transportation, so Father's move did not significantly impair Mother's custody rights. However, even if this court were to accept Father's legal argument, it cannot condone his unilateral action. Mother has always had legal custody of the Child and the right to know where the Child is living.

Upon consideration of these statutory factors, the court finds it in the best interest of the Child for the parties to share legal custody, for Mother to have primary physical custody, and for Father to have partial physical custody . . .

(Trial Ct. Op., 3/01/18, at 6-13).

Father first contends that the court erred in awarding primary physical custody to Mother because the decision was an abuse of discretion that was not supported by the credible evidence of record. (*See* Father's Brief, at 25). Essentially, Father takes issue with the court's findings regarding the custody factors and the weight accorded to each factor, challenging each finding by pointing to testimony in the record which he claims shows an abuse of discretion. (*See id.* at 26-37).

The trial court suggests that we find this issue waived for lack of specificity. (*See* Trial Ct. Op., 4/18/18, at 7-8); *see also Commonwealth v. Reeves*, 907 A.2d 1, 2 (Pa. Super. 2006), *appeal denied*, 919 A.2d 956 (Pa. 2007) (noting that if Rule 1925(b) statement is too vague, trial court may find issues waived). We decline to find waiver in this instance. However, Father's claim does not merit relief.

As already noted, the trial court is required to consider all of the Section 5328(a) factors in entering a custody order. *See J.R.M.*, *supra* at 652. Although the court is required to give "weighted consideration to those factors

- 14 -

which affect the safety of the child" pursuant to 23 Pa.C.S.A. § 5328(a), we have acknowledged that the amount of weight a court gives any one factor is almost entirely discretionary. *M.J.M. v. M.L.G.*, 63 A.3d 331, 339 (Pa. Super. 2013), *appeal denied*, 68 A.3d 909 (Pa. 2013) ("It is within the trial court's purview as the finder of fact to determine which factors are most salient and critical in each particular case.").

Father's first issue is at root a challenge to the trial court's findings of fact and determinations regarding the credibility and weight given to the evidence introduced at the hearing. Father questions the court's conclusions and invites us to re-find facts, re-weigh evidence, and re-assess the credibility of witnesses in line with his view of the case. This we cannot do. We do not disturb the trial court's findings of fact and determinations regarding the credibility and weight of the evidence absent an abuse of discretion, which we do not find in this case. *See E.R.*, *supra* at 527.

The trial court thoroughly and reasonably analyzed and addressed each Section 5328(a) factor. (*See* Trial Ct. Op. and Order, 3/01/18, 6-13; *see also* Trial Ct. Op., 4/18/18, at 7-8). After a careful review of the record, we conclude that the court's findings and determinations are supported by competent evidence of record. *See E.R.*, *supra* at 527. Accordingly, Father's first claim fails.

Father's second through seventh claims reiterate specific problems with the trial court's findings, but mostly take issue with the weight the trial court

afforded to each statutory factor or in whose favor each factor was found. (**See** Father's Brief, at 37-40).

Initially, we note that Father, who is represented by counsel, has cited no case law or any legal authority in support of his arguments. **See In re Estate of Whitley**, 50 A.3d 203, 209-10 (Pa. Super. 2012), *appeal denied*, 69 A.3d 603 (Pa. 2013) (noting that failure to cite to relevant legal authority constitutes waiver of claim on appeal); **see also** Pa.R.A.P. 2119(b), Pa.R.A.P. 2101. Accordingly, Father has waived these issues.

Moreover, each issue is supported by one or two paragraphs of argument, mostly consisting of conclusory statements and calls for this Court to re-weigh the trial court's findings of fact and credibility determinations, which were supported by the record. As we have previously stated, the standard does not allow for this manner of review. **See .E. R.**, **supra** at 527. Accordingly, we find that Father has waived these issues for purposes of appeal, but that, even if he had not, they lack merit. **See E.R.**, **supra** at 527; **Estate of Whitley**, **supra** at 209-10.

In Father's eighth and final issue, he contends that the court erred by failing to draw a negative inference from Mother's refusal to cooperate in the investigations to ascertain how C.S. sustained first and second degree burns on his foot and leg. (**See** Father's Brief, at 44). Father argues that although Mother was entitled to her Fifth Amendment right to remain silent during a criminal proceeding, the trial court can and should draw a negative inference from Mother's "silence" in a civil proceeding. (**Id.** at 45). We disagree.

Father relies on **Baxter v. Palmigiano**, 425 U.S. 308, 310 (1976) to support his argument that in civil cases, adverse inferences may be drawn from a party's invocation of their Fifth Amendment right to remain silent. **See id.** at 1559. In **Baxter**, the issue was an inmate's silence during a civil disciplinary proceeding. The Court ultimately found that permitting an adverse inference to be drawn from such a silence was not, on its face, an invalid practice. **See id.**

Here, the trial court noted:

While Mother did refuse to speak with the investigating officer on the advice of her attorney, her refusal was in the face of a criminal proceeding. In this she relied upon her right guaranteed in the Fifth Amendment that "[n]o person shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. In contrast, in the civil proceeding—the custody hearing—Mother did not remain silent. She testified at the direction of her counsel and was cross-examined by Father's counsel. Father's reliance on **Baxter** is therefore misplaced, and the court did not commit an abuse of discretion by declining to draw a negative inference based on Mother's refusal to speak with the investigating officer.

(Trial Ct. Op., at 14). We discern no error or abuse of discretion in this analysis and conclusion. Accordingly, we conclude that Father's claim does not merit relief. **See M.A.T.**, **supra** at 18-19; **E.R.**, **supra** at 527.

Accordingly, we affirm the trial court's custody order.

Order affirmed.

- 17 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>08/28/2018</u>